IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARY DAWES, INDIVIDUALLY, and as the ADMINISTRATOR OF THE ESTATE OF DECEDENT, GENEVIVE A. DAWES, ALFREDO SAUCEDO AS NEXT FRIEND OF MINORS, K.R AND C.R. and VIRGILIO ROSALES,<br><br>    Plaintiffs,<br><br>v.<br><br>THE CITY OF DALLAS, TEXAS, CHRISTOPHER HESS AND JASON KIMPEL,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br><br><br>CIVIL ACTION NO. 3:17-CV-1424<br>JURY TRIAL DEMANDED |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW, Mary Dawes, Individually as the surviving mother of Genevive A. Dawes and as the Administrator of the Estate of Genevive A. Dawes, deceased, Alfredo Saucedo as Next Friend of minors K.R. and C.R. and Virgilio Rosales ("Plaintiffs") complaining of Defendants the City of Dallas, Texas, more particularly the City of Dallas Police Department, Officer Christopher Hess and Jason Kimpel, in their individual and official capacity and for cause would show the Honorable Court as follows:

## I.

## NATURE OF THE ACTION

1.    This is an action brought by the Plaintiffs against The City of Dallas, Texas, Officers Christopher Hess and Jason Kimpel for their use of excessive and deadly force resulting in the death of Genevive Dawes ("Dawes") and injuries to Virgilio Rosales ("Rosales") under the

**PLAINTIFFS' SECOND AMENDED COMPLAINT** – Page 1

color of law, in violation of their individual rights under the Fourth Amendment of the United

States Constitution and, consequently, in violation of their civil rights pursuant to 42 U.S.C. §

1983.

2.      Plaintiffs allege that the Dallas City Council, the City of Dallas's final

policymaker for the Dallas Police Department, vested with all powers of the City and the

determination of all matters of policy and Interim Chief of Police, David Pughes ("Chief

Pughes"), with the authority for setting policies, including training of the Dallas Police Officers,

had a duty, but failed to implement and enforce such policies, practices and procedures for the

DPD that respected their constitutional rights to protection and equal treatment under the law.

3.      The Dallas City Council and Chief Pughes' failure to implement the necessary

policies and the (de facto) implementation of unconstitutional policies, caused Dawes to

experience an unwarranted and excruciating physical and mental anguish before her ultimate

death.  For these civil rights violations and other causes of action discussed herein, Plaintiffs

seek answers and compensation for their respective damages.

## II.

## PARTIES

4.      Plaintiff, Mary Dawes is a citizen of the United States and a resident of Dallas,

Texas. Mary Dawes is acting as the Administrator of the Estate of Genevive A. Dawes.

5.      Plaintiff, Alfredo Saucedo is a citizen of the United States and brings this lawsuit

as Next Friend of minors, K.R. and C.R.

6.      Plaintiff, Virgilio Rosales is a citizen of the United States and brings this lawsuit

in his individual capacity.

7.      Defendant, the City of Dallas, is a municipality located in Dallas County, Texas.

The City of Dallas funds and operates the DPD, which, along with the Dallas City Council, Dallas City Manager's office and Chief Pughes, are responsible for the implementation of the DPD's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The DPD is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Dallas. All actions that form the basis of this lawsuit were performed pursuant to policies and procedures, customs and practices of Defendant, the City of Dallas. The of City of Dallas' responsibility and duty to promulgate, implement, train and enforce policies and procedures prohibiting unlawful detentions, arrests, and exercises of excessive and deadly force, in violation of minimum constitutional and statutory requirements; to properly hire, fire, discipline, train and supervise police officers and to not hire or retain police officers with a known propensity for police misconduct.  The CITY OF DALLAS may be served with citation herein by and through its agent for service of process, Warren Ernst, City Attorney, Dallas City Hall, 1500 Marilla Street, Dallas, Texas 75201.  Additional service is being made on Mayor Mike Rawlings, 1500 Marilla Street, Room 5EN, Dallas, Texas 75201.

8.      Defendant, Christopher Hess ("Hess"), upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Dallas and DPD.  At all times relevant to this lawsuit, it was Officer Hess' duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the DPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Officer Hess is being sued in this lawsuit in both his individual and official capacity.  Defendant Hess may be served with citation at the Dallas Police Department, 1400 S. Lamar, Dallas, Texas 75215 or wherever he may be found.

9.     Defendant, Jason Kimpel ("Kimpel"), upon information and belief, is a resident of Dallas County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Dallas and DPD.  At all times relevant to this lawsuit, it was Officer Kimpel's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the DPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Officer Kimpel is being sued in this lawsuit in both his individual and official capacity.   Defendant Kimpel may be served with citation at the Dallas Police Department, 1400 S. Lamar, Dallas, Texas 75215 or wherever he may be found.

### III.

### JURISDICTION AND VENUE

10.     Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, *inter alia*, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities.

11.     Venue is proper in this court because the causes of action occurred within the Northern District of Texas, Dallas Division.

### IV.
### FACTS

12.     On or about January 18, 2017, during the early morning hours, Dallas Police Officers, including Defendants Hess and Kimpel, allegedly responded to a suspicious person call regarding individuals in a black Dodge Journey at an apartment complex located at 4700 East Side Avenue, Dallas, Dallas County, Texas.

13.     The vehicle was occupied by decedent, Genevive Dawes and Virgilio Rosales, who were both sleeping at the time the officers arrived and approached the vehicle.  Dawes had purchased the vehicle a month earlier but allegedly the individual who sold the vehicle to her was not authorized to do so.  Dawes was unaware of this and had been in possession of the vehicle under the assumption that she was the rightful owner.  Dawes was not aware that the vehicle had been reported stolen.

14.     As the officers approached the vehicle, with their flashlights pointed inside of the vehicle both Dawes and Rosales were clearly asleep.  Dawes was located in the driver's seat and Rosales was in the front passenger seat.  Moments later, upon information and belief, Dawes and Rosales were suddenly awakened and startled by the lights and sounds of voices.  Not aware of who was approaching her vehicle, Dawes turned on her vehicle and attempted to back out but an officer in a police vehicle drove into the path Dawes was traveling in.

15.     Dawes, still unaware of what was going on or who was blocking her path, pulled her vehicle slightly forward so she could have a clear path to back up.   As Dawes drove in reverse at a very slow rate of speed, Defendants Hess and Kimpel fired at least 13 shots through the passenger side window where Rosales was seated, striking Dawes four times in the neck, her right tricep, left arm, upper left chest and right forearm. Dawes's right earlobe was also partially amputated. Dawes was transported to Baylor Hospital where she later died as a result of her injuries.

16.     Based on the evidence, including body cam footage, immediately upon arriving at the scene, Officers Hess and Kimpel failed to conduct an objectively-reasonable assessment of the facts, before firing at Dawes and Rosales.

**PLAINTIFFS' SECOND AMENDED COMPLAINT** – Page 5

17.     Officers Hess and Kimpel were not facing or reacting to an imminent threat of death or serious bodily injury to them or any other person at the time they fired at least fourteen shots at Dawes and Rosales.

18.     Based on the evidence, including body cam footage, no one was in the back of Dawes' vehicle as she backed up at a very slow rate of speed, contrary to the statements made by Officer Hess.  Dawes was not attempting to run over a police officer with her vehicle nor was she driving at a high rate of speed when Officers Hess and Kimpel fired the fatal shots. Dawes and Rosales did not display a weapon nor did they attempt to harm anyone at the time of the fatal shooting, but despite that, Officers Hess and Kimpel chose to use deadly force, violating applicable use of force policies.

19.     This horrible tragedy was 100% preventable:   Dawes and Rosales were not committing a crime at the time the officers approached the vehicle.   Unfortunately, on the evening of her death, Dawes and Rosales chose what they thought was a safe spot.

20.     Upon information and belief, and based on body cam footage, Dawes did not intentionally try to hit a marked police vehicle as reported.  In fact, an officer drove the vehicle into the path of Dawes, refuting any claim that Dawes intentionally tried to hit the marked police vehicle.

21.      Upon information and belief, Dawes and Rosales were not in possession of a weapon at the time Officers Hess and Kimpel fired multiple shots at the vehicle. In fact, there was not a weapon in the sight of Officers Hess and Kimpel when they shot at Dawes and Rosales, fatally striking Dawes.

22.     Officers Hess and Kimpel unlawfully shot and killed Dawes without any warning, although they were not in imminent danger and when less deadly alternatives were

available.  Officers Hess and Kimpel placed Rosales in fear of his life as multiple shots were fired at him.

23.     Officers Hess and Kimpel failed to conduct an objectively, reasonable assessment of the facts when they chose to just start shooting without properly attempting to use de-escalation tactics to apprehend Dawes and Rosales without fatal incident.

24.     Dawes received four (4) gunshot wounds to the neck, all which appeared to have originated on the right side of her body.

25.     Dawes was taken to the Baylor University Medical Center and underwent emergency treatment in a futile attempt to save her life.

26.     As a result of the severity of the fatal shots, attempts at cardiopulmonary resuscitation were unsuccessful and Dawes was subsequently pronounced dead.

27.     Despite the unlawful shooting of Dawes and Rosales, Officers Hess and Kimpel have not been terminated.  Despite having body cam footage of the incident, the Dallas Police Department has not disciplined Officers Hess and Kimpel.  Officer Hess was indicted by the Dallas County Grand Jury for Aggravated Assault by a Public Servant.

28.     Officers Hess and Kimpel's actions tragically took Dawes' life and caused Rosales' injuries and is the logical and unconstitutional consequence of the DPD's odious and illegal pattern, practice, custom, and de facto policy of using unreasonable and unjustifiable force on suspects.

29.     The DPD's written policy on use of force is not the de facto policy of the DPD. The de facto policy is that which Officers Hess and Kimpel employed when they decided to approach and fire shots at Dawes and Rosales without warning and any attempt to de-escalate.

30.     The DPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. The DPD train its officers to shoot first and ask questions later.

31.     The DPD did not provide adequate training to Officers Hess and Kimpel as it relates to the use of deadly force and the use of non-deadly force.

32.     The DPD did not provide adequate training to Officers Hess and Kimpel on proper arrest and confrontation techniques.

33.     The DPD did not provide adequate training to Officers Hess and Kimpel on appropriate methods and techniques to control situations similar to the one encountered by them and other responding officers on January 18, 2017.

34.     The Dallas City Council, the City's final policymaker, Chief Hughes and the City knew or should have known that the training provided to Officers Hess and Kimpel was inadequate or nonexistent.

35.     Texas law requires a peace officer to demonstrate weapons proficiency at least annually.

36.     Officers Hess and Kimpel should have been well-trained to deal with unarmed citizens posing no threat of imminent bodily harm to them, other officers or the general public.

37.     Officers Hess and Kimpel had a clear view of Dawes's vehicle, however it is apparent, that instead of using any sort of de-escalation techniques, they opted for excessive and deadly force.

38.     Officers Hess and Kimpel entered the scene and almost immediately drew their weapon without an evaluation of what occurred or what was transpiring. They simply opened

fire without having any knowledge of the true situation. Essentially, Officers Hess and Kimpel were ill-trained, and as a result, defaulted to the defective DPD policy: to shoot first and ask questions later.

39.     This terrible tragedy was 100% preventable.  Two individuals were asleep in a car.  They were unaware of what was transpiring.  They were not attempting to harm anyone yet Dawes ended up dead.

40.      There is no credible evidence whatsoever that Officers Hess and Kimpel or anyone else were in imminent danger that would indicate that the use of excessive and deadly force was justified.

41.     Dawes and Rosales posed no risk to Officers Hess and Kimpel or any other person in the immediate area.  Dawes and Rosales did not attempt to harm Officers Hess and Kimpel and was not committing a crime when Officers Hess and Kimpel shot her multiple times, including four shots to Dawes's neck.

42.     Officers Hess and Kimpel's unlawful and unwarranted acts, lack of training and the official customs or policies of the DPD was the proximate cause of Dawes' death and Rosales' injuries.

43.     At all times material hereto, Officers Hess and Kimpel were believed to be acting in the scope of their employment as agents, servants, and employees of the DPD, a part of Defendant, the City of Dallas within its executive branch and were performing a governmental function.

44.     Moreover, no reasonably competent officer would have concluded that Officers Hess and Kimpel's actions described herein would not, and did not, violate Dawes and Rosales'

constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Officers Hess and Kimpel's conduct was justified.

45.    As a direct and proximate result of Officers Hess and Kimpel's conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

46.    Dawes was twenty-one (21) years old when she was murdered by Officers Hess and Kimpel.  Dawes was very well liked.  She was in good health, with a reasonable life expectancy of living at least 63 more years to age 84.  Dawes leaves behind her mother, two daughters, K.R. and C.R., Rosales and her siblings. Rosales was wrongfully arrested after witnessing the death of Dawes.  Rosales spent five months in jail and was not allowed to attend Dawes's funeral.

47.    K.R., C.R. and Mary Dawes have suffered pecuniary loss from the ***death*** of their mother and daughter by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. K.R., C.R. and Mary Dawes will suffer anguish, grief, and sorrow as a result of Dawes' ***death*** and are likely to continue to suffer for a long time in the future. For these losses, Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

48.    Upon information and belief, the DPD has not implemented policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of deadly force and have not disciplined officers, specifically Officers Hess and Kimpel, who were involved in the cover-up of a crime.

**V.**

**First Cause of Action**
**Unconstitutional Use of Excessive Force**
**42 U.S.C. § 1983 Violation of the Fourth Amendment by**

49.     Plaintiffs hereby adopt, incorporate, re-state and re-allege paragraphs 1 through 48, inclusive, with regard to all causes of action.

50.     Officers Hess and Kimpel, acting under color of law, used unreasonably excessive and deadly force and killed Dawes and injured Rosales without probable cause. In fact, Officers Hess and Kimpel had not verified if Dawes had actually stolen the vehicle or who were all inside of the vehicle. Officers Hess and Kimpel's firing into an occupied vehicle was reckless done with malice and placed innocent individuals at risk, including Dawes and Rosales.

51.     Officers Hess and Kimpel's actions violated Dawes and Rosales' constitutional rights giving rise to Plaintiffs' claims pursuant to the Fourth Amendment and 42. U.S.C. §1983 and other applicable law.

52.     Officers Hess and Kimpel violated Dawes and Rosales' constitutional rights to be free from excessive and deadly force. This right was clearly established at the time of the shooting.

53.     Nothing that Dawes and Rosales did posed an imminent threat to the safety of Officers Hess and Kimpel or others.

54.     Officers Hess and Kimpel's conduct was objectively unreasonable, which resulted from their lack of training and comported with the City of Dallas's illegal de facto policies.

55.     Dawes and Rosales presented no physical threat to either Officers Hess and Kimpel or the public and did nothing which could have placed a reasonable officer in fear for his life or the life of anyone else.

56.     As a result of Officers Hess and Kimpel's unjustified actions, Dawes and Rosales suffered an injury, which resulted directly and only from the use of force, that was clearly excessive (again, since there was no need at all), and the force used was objectively unreasonable and in violation of clearly established law.

57.     Officers Hess and Kimpel's duties and responsibilities in the January 18, 2017 shooting were well defined by applicable law and they knew or reasonably should have known that their conduct was below the standard prescribed by such law.

58.     As a result of the Defendants' violations of the constitutional standards set forth herein, and having sustained bullet wounds to the neck, right tricep, left arm, upper left chest and right forearm, Dawes and Rosales were treated inhumanely and incurred extreme pain and Dawes's untimely death.

59.     Based on these constitutional violations and the injuries and other damages sustained, Plaintiffs seek compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

### Second Cause of Action
### The City of Dallas' Failure to Train and Adequately Supervise or Discipline
### 42 U.S.C. § 1983 Violation of the Fourth Amendment

60.     Plaintiffs hereby adopt, incorporate, restate and re-allege paragraphs 1 through 59, inclusive, with regard to all causes of action.

61. The City of Dallas and the DPD, by and through the Dallas City Council, have an inadequate policy of training officers regarding the following areas of law enforcement:

    a.    The use of proper and appropriate detention and seizure procedures.

    b.    The use of excessive and/or deadly force.

    c.    The proper use of less deadly means.

62. Defendants Hess and Kimpel and other officers at the scene of the shooting incident were acting under color of law and acting pursuant to customs, practices and policies of the City of Dallas and the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council and Chief Hughes.  Dawes and Rosales were deprived of rights and privileges secured to them by the United States Constitution and by other laws of the United States, by the City of Dallas failing to provide proper training, adequate supervision or discipline in dealing with individuals such as Dawes in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

63. The City of Dallas's policy of inadequate and improper training of police officers on proper detention and seizure procedures and the use of excessive and/or deadly force, resulted in the constitutional deprivations and damages alleged herein.

64. The City of Dallas and the DPD failed to adequately train and failed to adequately supervise or discipline Officers Hess and Kimpel, despite their unlawful conduct.

65. Officers Hess and Kimpel's lack of training led to the use of excessive and deadly force and, ultimately, their killing of Dawes.

66. As a direct cause and result of the constitutional violations as set forth herein, Dawes and Rosales incurred extreme pain, injuries and, ultimately, Dawes's death for which the

Plaintiffs seek compensation, as set forth more specifically in the section of this Complaint entitled "Damages."

67.     The DPD has longstanding records of not providing DPD officers with adequate training on de-escalation techniques intended to prevent instances of excessive and deadly force and extrajudicial killings by Dallas Police officers.

68.     The actual practice or custom of the DPD regarding the use of deadly force is to "shoot first and ask questions later."

69.     As a result of the lack of training and the official custom or policies of the DPD, there have been a number of deadly police shootings of unarmed minorities.

70.     On or about July 24, 2012, unarmed James Harper ("Harper") was fatally shot by DPD officer Brian Rowden ("Rowden").  Rowden pursued Harper on foot and fired a shot at Harper as he ran away. Rowden was not disciplined for the unlawful killing of Harper. On or about March 10, 2013, unarmed Clinton Allen ("Allen") was fatally shot 7 times by DPD officer Clark Staller.  Allen was wrongfully gunned down although he held both hands up. Clark Staller, despite previously falsifying a police report prior to the shooting death of Allen, was allowed to remain on as an officer and was not disciplined for the death of Allen. Clark Staller was allowed to prepare his statement of the incident with the assistance of his attorney and was not asked any questions to determine the veracity of his statements. On or about October 14, 2013, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual, and attempted to falsify a police report but a video exposed the attempted cover-up.  David Blair, an unarmed individual was standing outside of his east Oak Cliff apartment on October 2, 2013, when a pair of Dallas Police Officers harassed him for no lawful reason.  The officers approached him, followed him to his

apartment and shot at him 14 times as he stepped out of his apartment for no lawful reason. Blair's story surfaced just a week after a video circulated of a Dallas police officer shooting Bennett, a man with mental challenges, after he stood up from a chair he set in the middle of a cul-de-sac.  Police initially claimed the man lunged at them, but the video showed otherwise.  An aggravated assault charge against the wounded man has since been dropped.  On December 10, 2013, 19-year-old Kelvion Walker was still in the vehicle with his hands up when a Dallas police officer shot him.  On August 27, 2015, an unarmed Bertrand Syjuan Davis was fatally shot by Officer Matthew Terry.  According to multiple witness accounts, immediately upon arriving at the scene, Officer Terry failed to conduct an objectively-reasonable assessment of the facts, drew his gun and shot Bert several times including once in the back, without any verbal warning. Per witnesses, Officer Terry was not facing or reacting to an imminent threat of death or serious bodily injury to him or any other person at the time he fired multiple shots that struck Bert, including one to the back.  Officer Terry was not disciplined by the DPD for his wrongful conduct.

71.    There exists a persistent, widespread practice of police shootings that result from the training or lack thereof, received by DPD officers.  Upon information and belief, DPD officers were trained by individuals with little or no experience working in the field.

72.    Criticism of the DPD's policies and procedures regarding the use of deadly force was first made by Geoffrey P. Alpert in his 1987 report.  In this report, Alpert points out that a new philosophy and a new approach to force was needed and would be required in order for Dallas to overcome its institutional training issues.

73.    The report further stated that in order for Dallas to enter the 1990's with a set of police policies, procedures and customs commensurate with its high set of municipal values, a

conscious decision must be made to overhaul a system creaking with age and tradition, and made obsolete by the challenges of a new generation of citizens.

74.     After the death of Harper, Chief Brown indicated that the following policies and procedures would be implemented, but has yet to formally implement each and recently removed them from the DPD's website:

> ### a.     *Formalize a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings*

This step was intended to reassure the public that the DPD is conducting a detailed and comprehensive investigation and that the findings are based upon facts uncovered by the investigation. The DPD has requested the FBI to conduct this type of review on several occasions.

> ### b.     *Implement a more comprehensive Response to Resistance reporting system*

A "Response to Resistance" report details the actions a suspect took against an officer and the steps an officer was required to take to overcome this resistance. A comprehensive reporting system was intended to allow for a more detailed analysis of incidents involving violence against officers and their response. Information gained was intended to be used to assist in developing and refining tactics, training and policy. The report was also intended to provide public transparency regarding the amount of force officers take in the performance of their duties.

> ### c.     *Develop a foot pursuit policy*

A formalized foot pursuit policy was intended to enhance officer safety by providing officers with a foundation on which to make decisions during these high risk activities with the

intent of reducing hazardous consequences and preventing, when possible, the escalation of enforcement action into lethal force confrontations.

### d.      Re-implement the Digital Video Recorder (DVR) Review Team

The DVR Team had been temporarily inactive while a panel of Police Deputy Chiefs reviewed the proper role for the Team. The dash cam video reviews conducted by this team can serve as a training tool for the Department while building public confidence that the Department proactively examines officer performance to ensure compliance with departmental and public expectations.

### e.      Implement a mandatory electronic control weapon (Taser) training policy for all officers

Currently, all officers that are trained with an electronic control weapon are required to carry one if available.

### f.      Enhance the Department's consensual search policy to include the requirement for a written and/or recorded consent

Implementing this step was intended to create greater public confidence in the consensual searches performed by DPD Officers, protect officers against false allegations of illegal search and bolster court cases where the search is critical to proving the charge.

### g.      Research best practices that have come from critical incidents or institutional failures in public safety from around the nation

In recent years, several major city police departments have been placed under consent decrees. The DPD proposes to research the positive practices and policies that have been developed as a response to these failures as a way to improve DPD's internal training, policy, officer safety and service delivery. This step was intended to include a review of the recommendations stemming from the 1988 Congressional Hearings that occurred in Dallas.

### h. Assemble a special Community Policing Strategic Team of officers for the Dixon Circle community

This step was intended to create a special team of officers responsible for addressing chronic crime and underlying quality of life issues present in the Dixon Circle community, while opening sustainable communications with this neighborhood to build trust between the residents and the DPD. The Police Athletic League was intended to play a vital role in this team effort to provide constructive alternatives for youth in the area. If successful, this concept will serve as a model for effecting positive change in other communities with similar crime and quality of life issues.

75. As noted above, Officers Hess and Kimpel used excessive and deadly force for no lawful reason when they shot at Dawes and Rosales without any warnings and for no lawful reason.

76. There is no evidence that Officers Hess and Kimpel and any other person were in imminent danger or in fear of serious bodily injury.  There were no signs of any danger that would indicate or suggest that the use of deadly force was justified.

77. The DPD's "Drawing or Displaying Firearms" general order requires that a threat, or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display his firearm.

78. As made clear from the body cam footage, Dawes and Rosales posed no risk to Officers Hess and Kimpel or any other person in the immediate area when Dawes and Rosales were attempting to leave from what they perceived to be imminent danger.

79. There is no indication that Officers Hess and Kimpel attempted to use their intermediate weapon before resulting to the use of deadly force.  General Order 901.04(D)(3)

Levels of Control; Electronic Control Weapon (Taser) is an intermediate weapon, and is only justified for situations when the officer believes empty hand control will be ineffective.

80. At the time Officers Hess and Kimpel drew their weapons, Dawes and Rosales had not done anything to justify Officers Hess and Kimpel's use of deadly force. Dawes and Rosales were unarmed at the time Dawes was shot multiple times and had not placed Officers Hess and Kimpel or any other person in fear of imminent death or seriously bodily injury.

81. The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect, and is to be applied under very narrowly defined circumstances.

82. According to Dallas Police General Order 906.02(D), "Authorization to Use Deadly Force," "Officers will only use deadly force to protect themselves or another person from imminent death or serious bodily injury."

83. General Order 906.02(E), "Drawing or Displaying Firearms," requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.

84. Dawes and Rosales posed no risk to Officers Hess and Kimpel, or any other person.

85. Officers Hess and Kimpel's unlawful and unwarranted acts, lack of training and the official customs or policies of the DPD caused Dawes' wrongful death and Rosales' injuries.

86. Plaintiffs would show that at all times material hereto, Officers Hess and Kimpel were acting individually and/or in the scope of their employment as agents, servants, and employees of the DPD and was performing a governmental function.

**PLAINTIFFS' SECOND AMENDED COMPLAINT** – Page 19

87.     Plaintiffs would further show that Officers Hess and Kimpel's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the DPD, in regard to the use of deadly force for which the Dallas City Council, the City of Dallas and Chief Hughes knew or should have known, but never provided the requisite and proper training.

88.     Moreover, no reasonably competent official would have concluded that the actions of Officers Hess and Kimpel described herein would not violate Dawes and Rosales' constitutional rights. In other words, no reasonably prudent police officer under similar circumstances, could have believed that Officers Hess and Kimpel's conduct was justified.

89.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

90.     Upon information and belief, the DPD has not implemented policies and procedures previously described to aggressively curtail deadly shooting cases that have been a major problem since the early eighties, when the DPD was the subject of a Federal Investigation, that continue to exist today.   The City of Dallas's failure to properly train, supervise and discipline its officers was the proximate cause of the violation of Dawes and Rosales' constitutional rights.

91.     Based on these constitutional violations and the injuries and other damages sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## SURVIVAL ACTION

92.     Plaintiffs incorporate by reference paragraphs 1 through 91 as if fully set forth herein.

**PLAINTIFFS' SECOND AMENDED COMPLAINT** – Page 20

93.     Plaintiff Mary Dawes is acting as the Personal Representative for the estate of Genevive A. Dawes.

94.     Dawes died as a result of the Defendants' wrongful conduct.

95.     Dawes would have been entitled to bring this action against the Defendants if she had lived.

96.     The decedent's right of action for wrongful conduct against the Defendants survive in favor of heirs, legal representatives, and the estate of the deceased.

97.     Defendants are liable to the estate of Genevive A. Dawes for the loss of Dawes' life, funeral expenses, pain and suffering, and the violation of her civil rights.  Plaintiff seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## WRONGFUL DEATH

98.     Plaintiffs incorporate by reference paragraphs 1 through 97 as if fully set forth herein.

99.     By reason of Officers Hess and Kimpel's wrongful conduct of killing Dawes without the threat of imminent death or serious bodily harm, Defendants are liable to Plaintiffs for damages.

100.    Officers Hess and Kimpel's conduct caused Dawes' death and was a producing cause of her injuries, which resulted in the damages enumerated below.

101.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## DAMAGES ALL DEFENDANTS

102.    Plaintiffs incorporate by reference paragraphs 1 through 101 as if fully set forth

herein.   Defendants' acts and/or omissions were a proximate cause of the following Injuries suffered by Plaintiffs:

a. Actual damages;

b. Loss of affection, consortium, comfort,  financial assistance, protection, affection and care;

c. Pain and suffering and mental anguish suffered by Dawes prior to her death;

d. Mental anguish and emotional distress suffered by Plaintiffs;

e. Loss of quality of life;

f. Funeral and burial expenses;

g. Loss of service;

h. Loss of earnings and contributions to Plaintiffs;

i. Exemplary and punitive damages for Plaintiffs K.R. and C.R.;

j. Pursuant to 42 U.S.C. §1988, and other applicable laws, Plaintiff should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

k. Prejudgment interest; and

l. Post judgment interest.

103.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## PUNITIVE AND EXEMPLARY DAMAGES

104.    Plaintiffs incorporate by reference paragraphs 1 through 102 as if fully set forth herein.  Additionally, and in the alternative, the conduct of Defendants Hess and Kimpel was done with malice.  As such, Plaintiffs request punitive and exemplary damages to deter this type

of conduct in the future.  In the alternative, such heedless and reckless disregard of Dawes and Rosales' rights, safety and welfare is more than momentary thoughtlessness, inadvertence or misjudgment. Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiffs request that punitive and exemplary damages be awarded against Defendants Hess and Kimpel in a sum which is within the jurisdictional limits of this court.

## COSTS AND ATTORNEY FEES

105.    Plaintiffs incorporate by reference paragraphs 1 through 104 as if fully set forth herein.  Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b). As such, Plaintiffs request the Court to award costs and attorney fees incurred in Plaintiffs' prosecution of this litigation.

## CONDITIONS PRECEDENT

106.    Plaintiffs reserve their right to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiffs' recovery have been performed or have occurred.

## TRIAL BY JURY

107.    Plaintiffs have paid a jury fee and demand trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show they are justly entitled.


Respectfully submitted,


By: /s/ DARYL K. WASHINGTON
     Daryl K. Washington
     State Bar No. 24013714
     WASHINGTON LAW FIRM, PC
     325 N. St. Paul St., Suite 3950
     Dallas, Texas 75201
     214-880-4883
     214-751-6685 - fax
     Email: dwashington@dwashlawfirm.com

     **ATTORNEYS FOR PLAINTIFFS**