**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MARY DAWES, INDIVIDUALLY,** | § | |
| **AND AS THE ADMINISTRATOR OF** | § | |
| **THE ESTATE OF DECEDENT,** | § | |
| **GENEVIVE A. DAWES, ALFREDO** | § | |
| **SAUCEDO AS NEXT FRIEND OF** | § | |
| **MINORS, K.R. AND C.R. AND** | § | |
| **VIRGILIO ROSALES** | § | **CIVIL ACTION NO. 3:17-CV-1424** |
| | § | **JURY TRIAL DEMANDED** |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **THE CITY OF DALLAS, TEXAS,** | § | |
| **CHRISTOPHER HESS, AND** | § | |
| **JASON KIMPEL** | § | |
| *Defendants*. | § | |

**DEFENDANT, SENIOR CORPORAL JASON KIMPEL'S, MOTION AND BRIEF**
**TO DISMISS, AND IN THE ALTERNATIVE, REQUEST FOR RULE 7(a) REPLY**
**TO IMMUNITY DEFENSE**

TO THE HONORABLE CHIEF JUDGE SIDNEY A. FITZWATER:

COMES NOW Defendant Senior Corporal Jason Kimpel ("Senior Corporal Kimpel" or "Defendant Kimpel") in the above-styled and numbered cause, and submits this *Motion and Brief to Dismiss, and in the Alternative, Request for Rule 7(a) Reply to Immunity Defense* ("*Motion and Brief*"). Senior Corporal Kimpel respectfully requests that Plaintiffs' claims against him be dismissed entirely and with prejudice, or in the alternative, that Plaintiffs be ordered to file a Rule 7(a) Reply to his Qualified Immunity assertions. In support of the *Motion and Brief*, Senior Corporal Kimpel would respectfully show this Honorable Court the following:

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

I.    SUMMARY OF PROCEDURAL POSTURE ................................................... 1

II.   IDENTIFICATION OF LIVE PLEADINGS, SUMMARY OF CLAIMS, ALLEGATIONS, AND ADMISSIONS ............................................................. 2

      A.    Claims and Defenses in Live Pleading. ................................................ 2
      B.    Plaintiffs' Allegations and Admissions. ............................................... 3

III.  STATEMENT OF UNDISPUTED AND RELEVANT FACTS ....................... 4

IV.   LEGAL STANDARD FOR DISMISSAL ...................................................... 15

V.    PLAINTIFFS' CLAIMS AGAINST SENIOR CORPORAL KIMPEL FAIL AS A MATTER OF LAW ................................................................................. 17

      A.    Plaintiffs Cannot State a Claim for Excessive Force Against Senior Corporal Kimpel. ................................................................................ 17
      B.    Plaintiffs' Federal Claims Against Senior Corporal Kimpel Are Barred by Qualified Immunity ............................................................. 20
      C.    Plaintiffs' State-Law Claims Against Senior Corporal Kimpel Fail As a Matter of Law. .................................................................................... 28

VI.   ALTERNATE REQUEST FOR A REPLY PURSUANT TO Fed. R. Civ. P. 7(a) ......... 31

      A.    Overview of Plaintiffs' Claims ........................................................... 31
      B.    Requirements for Factually Specific Allegations ............................... 31
      C.    Senior Corporal Kimpel's Specific Factual Assertions of Immunity ........ 32
      D.    Plaintiffs' Complaint is Not Sufficient .............................................. 39

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) .................................................................................................. 20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................ 1, 15, 16

*Backe v. LeBlanc,*
  691 F3d 645 (5th Cir. 2012) ......................................................................... 1, 31, 32

*Baker v. Putnal,*
  75 F.3d 190 (5th Cir. 1996) ...................................................................................... 15

*Ballantyne v. Champion Builders, Inc.,*
  144 S.W.3d 417 (Tex. 2004) ..................................................................................... 31

*Ballard v. Burton,*
  444 F.3d 391 (5th Cir. 2006) .................................................................................... 17

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................... 15, 16

*Brosseau v. Haugen,*
  543 U.S. 194 (2004) .................................................................................................. 18

*Brown v. Faison,*
  No. Civ.A. 6:04-CV-016-C, 2005 WL 473681 (N.D. Tex. 2005) .......................... 17

*Bush v. Strain,*
  513 F.3d 492 (5th Cir. 2008) .................................................................................... 17

*City of El Paso v. Heinrich,*
  284 S.W.3d 366 (Tex. 2009) ..................................................................................... 29

*City of Lancaster v. Chambers,*
  883 S.W.2d 650 (Tex. 1994) ............................................................................... 30, 31

*Collins v. Ainsworth,*
  382 F.3d 529 (5th Cir. 2004) .................................................................................... 20

*Crawford-El v. Britton,*
  523 U.S. 574 (1998) ....................................................................................... 31, 32, 39

*Flores v. City of Palacios,*
  381 F.3d 391 (5th Cir. 2004) .................................................................................... 17

*Franka v. Velasquez,*
   332 S.W.3d 367 (Tex. 2011) ............................................................. 29, 30

*Gates v. Tex. Dep't of Protective & Regulatory Servs.,*
   537 F.3d 404 (5th Cir. 2008) ........................................................... 20, 28

*Gonzalez v. Kay,*
   577 F.3d 600 (5th Cir. 2009) ................................................................. 16

*Goodson v. City of Corpus Christi,*
   202 F.3d 730 (5th Cir. 2000) ................................................................. 20

*Graham v. Connor,*
   490 U.S. 386 (1989) ................................................................... 17, 18, 22

*Harless v. Niles,*
   100 S.W.3d 390 (Tex. App.—San Antonio, 2002, no pet.) ...................... 30

*Hathaway v. Bazany,*
   507 F.3d 312 (5th Cir. 2007) .......................................................... passim

*Ikerd v. Blair,*
   101 F.3d 430 (5th Cir. 1996) ................................................................. 17

*In re So. Scrap Material Co.,*
   541 F.3d 584 (5th Cir. 2008) ................................................................. 16

*Kramer v. Lewisville Mem'l Hosp.,*
   858 S.W.2d 397 (Tex. 1993) ................................................................. 29

*Lion Boulos v. Wilson,*
   834 F.2d 504 (5th Cir. 1987) ........................................................... 31, 32

*Lytle v. Bexar County Tex.,*
   560 F.3d 404 (5th Cir. 2009) ................................................................. 21

*Malley v. Briggs,*
   475 U.S. 335 (1986) ............................................................................. 20

*McClendon v. City of Columbia,*
   305 F.3d 314 (5th Cir. 2002). ................................................................ 19

*Morgan v. Hubert,*
   335 F. App'x 466 (5th Cir. 2009) ........................................................... 16

*Murray v. Earle,*
   405 F.3d 278 (5th Cir. 2005) ........................................................... 30, 31

*Ontiveros v. City of Rosenberg,*
 564 F.3d 379 (5th Cir. 2009) ................................................................ 18

*Pearson v. Callahan,*
 555 U.S. 223 (2009) ............................................................................. 20

*Peterson v. City of Fort Worth,*
 588 F.3d 838 (5th Cir. 2009) .......................................................... 17, 28

*Ramirez v. Khoulton,*
 542 F.3d 124 (5th Cir. 2008) ...................................................... 17, 18, 19

*Sanchez v. Edwards,*
 433 Fed. App'x 272 (5th Cir. 2011) .............................................. 21, 22

*Saucier v. Katz,*
 533 U.S. 194 (2001) ...................................................................... 18, 20

*Schultea v. Wood,*
 47 F.3d 1427 (5th Cir. 1995) .................................................. 1, 31, 32

*Scott v. Harris,*
 550 U.S. 372 (2007) ............................................................................. 2

*Smith v. Freland,*
 954 F.2d 343 (6th Cir. 1992) ............................................................ 18

*Stewart v. Murphy,*
 174 F.3d 530 (5th Cir. 1999). ......................................................... 19

*Stroik v. Ponseti,*
 35 F.3d 155 (5th Cir. 1994) ...................................................... 18, 25

*Tennessee v. Garner,*
 471 U.S. 1 (1985) ............................................................................ 17

*Vasquez v. Hernandez,*
 844 S.W.2d 802 (Tex. App.—San Antonio 1992, writ dism'd w.o.j.) ................... 30

*Waterman v. Batton,*
 393 F.3d 471 (4th Cir. 2005) ................................................... passim

*West v. Atkins,*
 487 U.S. 42 (1988) .......................................................................... 17

*Williams v. Bramer,*
 180 F.3d 699 (5th Cir. 1999). ......................................................... 17

*Wright v. City of Garland*,
  2014 U.S. Dist. LEXIS 159703 (N.D. Tex. Nov. 13, 2014) ................................. 21, 24, 25, 26

*Zapata v. Melson*,
  750 F.3d 481 (5th Cir. 2014) ........................................................................... 1, 31, 32

**Statutes**

Tex. Civ. Prac. & Rem. Code § 101.106(f) ........................................................ 29, 30

Tex. Civ. Prac. & Rem. Code § 71.002 ............................................................... 29

**Rules**

Fed. R. Civ. P. 7(a) ............................................................................................ 1, 32

Fed. R. Civ. P. 8(a)(2) ....................................................................................... 15

# I.    SUMMARY OF PROCEDURAL POSTURE

1.    Plaintiffs Mary Dawes, Individually and as the Administrator of the Estate of Decedent, Genevive A. Dawes ("Dawes"), Alfredo Saucedo as Next Friend of Minors, K.R. and C.R., and Virgilio Rosales ("Rosales") (collectively, "Plaintiffs") collectively pursue federal and state claims against the City of Dallas, Texas, Christopher Hess ("Officer Hess"), and Senior Corporal Kimpel (collectively, "Defendants") based on the January 18, 2017 shooting in the City of Dallas, Texas.

2.    Plaintiffs' *Second Amended Complaint* (Doc. 11) fails to provide sufficient factual details to adequately explain how Senior Corporal Kimpel's involvement in the incident overcomes his Qualified Immunity Defenses.  Plaintiffs' *Second Amended Complaint* also fails to provide sufficient factual details to adequately explain the claims against Senior Corporal Kimpel.  Without adequate factual detail, the conclusory assertions are insufficient to state a claim for relief that is plausible on its face under the governing standards.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, Plaintiffs' *Second Amended Complaint* is not sufficient to overcome a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6).

3.    Senior Corporal Kimpel asserts his Qualified Immunity Defense and respectfully seeks dismissal on that basis.  Alternatively, should this Honorable Court not dismiss the case at this stage, the Court should require Plaintiffs to file a factually specific Reply pursuant to FED. R. CIV. P. 7(a) to address Senior Corporal Kimpel's detailed Qualified Immunity assertions, pursuant to the procedures established by the Fifth Circuit in *Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995); *Backe v. LeBlanc*, 691 F3d 645 (5th Cir. 2012); and *Zapata v. Melson*, 750 F.3d 481 (5th Cir. 2014).[1]

---

[1] Here, video and audio recordings capture key portions of the events, and cannot be disregarded merely based on any allegations Plaintiffs make that are discredited by such indisputable recordings. *Scott v. Harris*, 550 U.S. 372,

## II.   IDENTIFICATION OF LIVE PLEADINGS, SUMMARY OF CLAIMS, ALLEGATIONS, AND ADMISSIONS

### A.   CLAIMS AND DEFENSES IN LIVE PLEADING.

4.      Plaintiffs filed *Plaintiffs' Second Amended Complaint* on June 27, 2017 (Doc. 11). Plaintiffs' *Second Amended Complaint* expressly identifies two federal claims and two state-law claims:

i.      Alleged excessive force by Officer Hess and Senior Corporal Kimpel in the shooting of Dawes in violation of the Fourth Amendment (Doc. 11 pp. 11–12 ¶¶ 49–59);

ii.     Alleged violation of Dawes's and Rosales's *Fourth Amendment* substantive due process rights by The City of Dallas in failing to train, supervise, or discipline Officer Hess and Senior Corporal Kimpel regarding constitutionally permissible use of force (Doc. 11 pp. 12–20, ¶¶ 60–91);

iii.    A state-law survival action by Mary Dawes as alleged administrator of Dawes's estate arising from the shooting of Dawes against all Defendants. (Doc. 11 pp. 20–21 ¶¶ 92–97); and

iv.     A state-law wrongful death action by Plaintiffs against all Defendants for the shooting of Dawes.  (Doc. 11 p. 21 ¶¶ 98–101).

5.      In his Original Answer, Affirmative Defenses, FRCP 7(a) Request, and Jury Demand to Plaintiffs' *Second Amended Complaint*, Senior Corporal Kimpel answers and asserts his Qualified Immunity Defense to Plaintiff's constitutional claims, and his affirmative defense that Plaintiffs' state-law claims are barred by the Texas Tort Claims Act ("TTCA").  (Doc. 26). Plaintiffs bear the pleading and evidentiary burdens to overcome these Defenses.  They cannot satisfy either burden.  Specifically, Plaintiffs cannot show that Senior Corporal Kimpel acted objectively unreasonably in violation of a clearly established constitutional right.  Likewise, Plaintiffs' state-law claims against the City of Dallas are barred as against City of Dallas employee Senior Corporal Kimpel.  Therefore, Plaintiffs' claims against Senior Corporal Kimpel

379-380 (2007).

should be dismissed based on Senior Corporal Kimpel's Qualified Immunity and Affirmative Defenses.  Senior Corporal Kimpel also seeks dismissal because Plaintiffs' live pleading fails to state an actionable claim under Federal Rule of Civil Procedure 12.

6.     For the reasons discussed herein, and supported by the *Appendix in Support* filed concurrently herewith, this Honorable Court should dismiss Plaintiffs' claims, in their entirety, with prejudice.

## B.     PLAINTIFFS' ALLEGATIONS AND ADMISSIONS.

7.     Plaintiffs allege that on January 18, 2017, Dallas Police Officers were summoned to an apartment complex at 4700 Eastside Avenue in Dallas, Texas to investigate a suspicious car parked at the rear of the complex.  (Doc. 11 p. 4 ¶ 12).  Senior Corporal Kimpel was one of the responding Officers.  (Doc. 11 p. 4 ¶ 12).  Plaintiffs allege that Dawes and Rosales were asleep in the car; Dawes in the driver's seat and Rosales in the passenger's seat.  (Doc. 11 p. 5 ¶¶ 13–14).  Plaintiffs acknowledge that the car had been reported stolen.  (Doc. 11 p. 5 ¶ 13).

8.     The Officers approached the car with flashlights directed at the car.  (Doc. 11 p. 5 ¶ 14).  Plaintiffs admit that Dawes and Rosales were awakened by the lights and the Officer's voices.  (Doc. 11 p. 5 ¶ 14).  Plaintiffs further admit that Dawes started the car and attempted to back out of the parking space.  (Doc. 11 p. 5 ¶ 15).  Plaintiffs allege that an Officer drove a Police Vehicle into Dawes's path.  (Doc. 11 p. 5 ¶ 15).  Allegedly unaware that Police Officers were approaching her vehicle and blocking her path, Dawes allegedly pulled "slightly forward" to access a clear path past the Police Vehicle blocking her car, and then slowly backed up.  (Doc. 11 p. 5 ¶ 15).

9.     Plaintiffs allege that Officer Hess and Senior Corporal Kimpel then fired through the passenger-side window into Dawes's car without warning.  (Doc. 11 pp. 5, 7 ¶¶ 15–16, 29).  Four shots struck and killed Dawes.  (Doc. 11 p. 7 ¶¶ 24–26).

10.     Plaintiffs allege that there were no Officers in the path of Dawes's car, that Dawes did not intentionally try to hit a marked Police Vehicle, and that Dawes and Rosales were not "in possession of a weapon" when Officers shot into the car.  (Doc. 11 p. 6 ¶¶ 18–21).

### III.     STATEMENT OF UNDISPUTED AND RELEVANT FACTS

11.     At all times relevant to the Plaintiffs' claims, Senior Corporal Kimpel was a Public Official, a Texas Commission on Law Enforcement ("TCOLE") certified Peace Officer, employed by the Dallas Police Department, wearing his Official Uniform, and operating a marked/lit Patrol Vehicle.

12.     On January 18, 2017, Dallas Police Department Dispatch sent uniformed Police Officers to respond to a report of a suspicious suspect car at the apartment complex rear parking lot located at 4700 Eastside Avenue.  The Officers were informed via radio and the call sheet that the suspect car was a Dodge Journey that was reported stolen out of Irving.  (Exhibit 12).

13.     Six Officers were initially sent to the location. Officers Zachary Hopkins and Officer Christopher Alisch were first on scene at the apartment complex.  While en-route, Officers Hopkins and Alisch discussed the best method to approach the stolen/suspect car in the crowded parking lot.  (Exhibit 1, 1:08).  They located the Dodge Journey ("suspect car") in the east corner of the rear parking lot.  (Exhibit 1, 2:03).  Hopkins circled around to the rear of the suspect car.

14.     Hopkins radioed to Officers Peter Lickwar and Erin Evans to join him on foot. Officers Evans and Lickwar parked their Patrol Vehicle to block the far north entrance to the parking lot, and walked south to join Hopkins at the suspect car.  (Exhibit 2, 0:14).  Hopkins radioed that they were going to conduct a Felony/High Risk stop on the stationary suspect car. (Exhibit 1, 2:54).

15.     Officers Christopher Hess and Senior Corporal Jason Kimpel pulled their Patrol Vehicle to the rear parking lot behind Hopkins's and Alisch's Patrol Vehicle, and exited towards the south corner.  (Exhibit 3, 0:22).  The Patrol Vehicles were blocking that southernmost entrance to the rear parking lot.  Kimpel joined Hopkins and Evans on the southeast fence line next to the suspect car.  (Exhibit 3, 0:33; Exhibit 1, 3:13).

16.     The parking lot was dimly lit by overhead lights in the row of covered parking spaces behind the suspect car, and the Dallas Officers were the only persons using flashlights at the scene.  Officers Hopkins and Alisch were shining their flashlights at the suspect car.  All officers on scene were wearing Dallas Police uniforms that clearly identified them as Police Officers.  (Exhibit 3, 0:33; Exhibit 1, 3:13).

17.     As Officers Evans and Lickwar approached from the north, Officer Hopkins yelled towards the suspect car, "**Driver! Driver! Put your hand out the window!**"  (Exhibit 1, 3:14).  Officer Hopkins told Alisch, "I don't even know if it's occupied right now."  (Exhibit 1 3:22).  With the Officers' flashlights shining at the suspect car, Hopkins yelled, "**Driver! Put your hands out the window!**"  (Exhibit 1 3:28).  Hopkins said, "Nope - I can't even tell if it's occupied still.  We are just gonna move up on it. Yes? No?"  (Exhibit 1, 3:32; Exhibit 3, 0:50).

18.     Officer Hess told the other Officers that he was going to pull his Patrol Vehicle behind the suspect car.  (Exhibit 4, 1:34).  Kimpel then said, "Hey - I'm gonna guess it's not occupied."  (Exhibit 3, 1:19).  Officer Hopkins responded, "Well, the last comment was a male and a female inside."  (Exhibit 1, 4:04; Exhibit 3, 1:20).  Evans noted, "It's got foggy windows."  (Exhibit 2, 1:52).  Condensation on the car's windows inhibited the Officers' ability to see inside the suspect car.  (Exhibit 1 4:06, 4:42; Exhibit 3, 1:47).

19.     The six Dallas Officers approached the suspect car as Officer Hess moved a Patrol Vehicle within approximately 10-15 feet of the suspect car.  (Exhibit 1 4:10).  The Patrol Vehicle faced the rear passenger side of the suspect car at an angle.   The Vehicle had its headlights and overhead spotlight on the suspect car, but Officer Hess did not activate the emergency lights.   Officers later indicated that engaging the emergency flashers would have made it more difficult to see inside the suspect car due to the condensation on the windows.

20.     At this point, approximately one (1) minute since Dallas Police first made contact with the suspect car, there had still been no response and/or compliance from the occupants of the suspect car.

21.     Senior Corporal Kimpel moved towards the Patrol Vehicle as it approached the suspect car.  (Exhibit 3, 1:31; Exhibit 1, 4:14).  As Officer Hess pulled the Vehicle into position, he sounded the emergency siren and the loud air horn to alert the occupants of the suspect car that Dallas Officers were outside.  (Exhibit 3, 1:31).  Hopkins moved next to the Patrol Vehicle's front driver-side door.  (Exhibit 1, 4:20).  After parking, Hess again sounded the Patrol Vehicle's loud air horn for identification.  (Exhibit 1, 4:10).

22.     One Officer said, "I can't tell if there's anybody in there," and Officer Hopkins asked Officer Lickwar is he could see anyone.  (Exhibit 1, 4:29).  The Officers continued shining their flashlights into the suspect car.  (Exhibit 1, 4:33; Exhibit 3, 1:50).  Officer Lickwar, who was the closest to the front passenger door, looking from behind a white van parked adjacent to the suspect car, responded, "Not from here."  (Exhibit 4, 2:20).

23.     Officer Hopkins told the Officers, "Let's just move up."   (Exhibit 1, 4:36).  Officers Hopkins, Evans, and Kimpel slowly approached the suspect car from the rear, coming within an arm's length of the suspect car and standing in front of the Patrol Vehicle.  (Exhibit 3,

2:03).  All Officers had their guns drawn and were illuminating/flooding the suspect car with their handheld flashlights.  (Exhibit 1, 4:50; Exhibit 3, 2:03).

24.  Officer Hopkins reached for the rear passenger-side door and pulled the handle, it was locked.  (Exhibit 1, 4:48).  He quickly retreated a few feet and another Officer said, "It's occupied, it's occupied, they were sleeping."  (Exhibit 1, 4:50).  Approximately one minute thirty-nine seconds had elapsed since Dallas Police first contacted the suspect car, and still there was no response/compliance from the suspect car.

25.  An Officer shouted to the suspect car, "**Let me see your hands!**"  (Exhibit 1, 4:53; Exhibit 3, 2:10).  Officer Lickwar reacts to this call by retreating from his position near the front of the suspect car and moving towards Officer Hess's Patrol Vehicle.  (Exhibit 4, 2:40). Officer Hopkins commanded, "**Hands up!**" and another Officer loudly added, "**Let me see your hands!**" (Exhibit 1, 4:52).

26.  Officer Hopkins attempted to open the rear hatch on the suspect car, but it was also locked.  (Exhibit 1, 4:58).  Officers Hopkins and Kimpel retreated a few more steps until they could see the driver's side of the suspect car.  (Exhibit 1, 5:01).  Senior Corporal Kimpel mentioned to Officer Hopkins, "There's a bunch of s*** back there."  (Exhibit 3, 2:10).

27.  Officer Evans told Officer Hess: "I can't see s***."  (Exhibit 2, 2:52).  Officer Hess yelled to the suspect car, "**Get your hands up, open the door!**"  (Exhibit 1, 5:08). Another Officer added, "**Dallas Police!**"  (Exhibit 1, 5:12).

28.  The Officers stood in a semicircle around the rear of the suspect car with their guns drawn and their handheld flashlights pointing at/in the suspect car.  (Exhibit 3, 2:21).  The Patrol Vehicle's front headlights and overhead lights also illuminated the suspect car.  Senior Corporal Kimpel asked the group, "What do you think?"  (Exhibit 3, 2:35).

29.     Officer Lickwar yelled, "**Dallas Police! Show me your hands!**" (Exhibit 1, 5:21; Exhibit 3, 2:38; Exhibit 4, 3:08).  An individual can be seen moving inside the suspect car, and Senior Corporal Kimpel declared, "He's movin' in there now." (Exhibit 3, 2:40).  Officer Lickwar shouted, "**Show me your hands!**" and another Officer shouted: "**Put your hands outside the vehicle right now!**" (Exhibit 3, 2:51).  Senior Corporal Kimpel again stated, "Somebody's moving around in the back." (Exhibit 1, 5:39; Exhibit 3, 2:55).

30.     The Officers at the rear of the suspect car retreated a few steps towards the front driver-side corner of Officer Hess's Patrol Vehicle.  (Exhibit 1, 5:39; Exhibit 3, 2:55).  Approximately two minutes and twenty-six seconds had elapsed since Dallas Police first contacted the suspect car, and still there was no response or compliance from the occupants of the suspect car.

31.     Officer Hess then screamed at the occupants, "**Hands UP!**"  (Exhibit 5, 0:37).  Officer Hopkins warned Senior Corporal Kimpel to back up, "Come on Kimpel, back a little bit . . . .  Let's at least get this car right here because they got that car." (Exhibit 1, 5:47).  Senior Corporal Kimpel retreated across the parking lot with the Officers, and stopped facing the rear of the suspect car.  (Exhibit 1, 5:56; Exhibit 3, 3:10).  He and Officer Hopkins stood in front of a support post for the covered parking structure directly behind the suspect car.  Senior Corporal Kimpel and Officer Hopkins were not behind cover.  (Exhibit 1, 5:56).

32.     After more than two-and-a-half minutes with no response to the Dallas Police Officers arrayed outside the suspect car, Dawes started the suspect car's engine.  (Exhibit 1, 5:55; Exhibit 3, 3:11; Exhibit 5, 0:50).

33.     Officer Lickwar yelled louder this time, "**LET ME SEE YOUR HANDS!**" (Exhibit 2, 3:41; Exhibit 4, 3:45).  With his flashlight directed at the driver's side window,

Senior Corporal Kimpel activated a strobe effect on his flashlight for a few seconds and then switched back to a straight beam. (Exhibit 3, 3:14). Officer Evans took a position behind the Patrol Vehicle, and Officer Lickwar was positioned on the passenger side of the Patrol Vehicle. (Exhibit 2, 3:41; Exhibit 4, 3:45). Officer Hess stepped into the Patrol Vehicle, saying "S***," (the door remained open) and pulled forward until the Vehicle's bumper was behind the rear passenger-side corner of the suspect car. (Exhibit 5, 0:50). Hess warned the other Officers of his actions, saying "watch out" and "move, move, move."

34.     The suspect car's reverse lights came on. (Exhibit 1, 6:02; Exhibit 3, 3:18). As Officer Hess stopped the Patrol Vehicle, Dawes reversed the suspect car and turned her wheel hard to the right, directing the suspect car into the front of Officer Hess's Patrol Vehicle. (Exhibit 1, 6:02). The suspect car's rear bumper crunched against the front of the Patrol Vehicle; Officer Hess was still in the Patrol Vehicle at that time with the driver's door open. (Exhibit 1, 6:05).

35.     Again, Officer Lickwar commanded: "**SHOW ME YOUR HANDS, NOW!**" and Officer Hess shouted: "**SHOW ME YOUR HANDS!**" (Exhibit 1, 6:08).

36.     As Officer Hess exited the Patrol Vehicle, Dawes accelerated the car forward, ramming it into the white lattice fence in front of the car. (Exhibit 1, 6:08; Exhibit 3, 3:24, Exhibit 5, 1:06). Dawes intentionally accelerated the car to ram through the white lattice fence in front of her without regard to the Officers/persons in the area. As Dawes accelerated towards and rammed the fence, there is no indication that she touched her brakes. The fence, which surrounded the parking lot, buckled but did not give way. (Exhibit 1, 6:09; Exhibit 3, 3:25).

37.     When the fence stopped the suspect car, Dawes hit the brakes momentarily then put the car in reverse. (Exhibit 3, 3:25). Senior Corporal Kimpel and Officer Hopkins were

along the southeast fence line, directly behind the suspect car.  (Exhibit 2, 3:56).  Had the suspect car reversed at this point, Officer Hopkins and Senior Corporal Kimpel would have been squarely in the car's path.  Senior Corporal Kimpel, standing behind the suspect car, moved to his right, towards the Patrol Vehicle.  (Exhibit 1, 6:10).

38.     Senior Corporal Kimpel was standing slightly in front and to the left of Officer Hopkins, thus he would have to cross in front of Officer Hopkins to move to his right.  Senior Corporal Kimpel alerted Officer Hopkins that he was going to cross his line of fire, stating, "Watch out, watch out, watch out, watch out."  (Exhibit 1, 6:12).  Officer Hess said to the two Officers behind him, "Back up, back up," as they moved backwards away from the moving, threatening, forceful, dangerous, and noncompliant suspect car and its Occupants.  (Exhibit 5, 1:10).

39.     Officer Hopkins slowly moved to his right.  (Exhibit 1, 6:12).  No officer was facing towards Officer Hopkins as he moved to his right; they all had their firearms and flashlights focused on the moving, threatening, forceful, dangerous, and noncompliant suspect car and its Occupants.  (Exhibit 3, 3:30).

40.     Officer Hess stood next to the open door on the Patrol Vehicle.  (Exhibit 5, 1:13).  As the suspect car reversed and passed in front of Officer Hess and the Patrol Vehicle (from right to left), Hess yelled, "**DON'T MOVE!**"  (Exhibit 1, 6:18; Exhibit 5, 1:15).  Approximately three minutes and five seconds had elapsed since Dallas Police first made contact with the suspect car, without any response or compliance from the Occupants.

41.     Fearing for his safety and other Officers' safety, Officer Hess fired approximately nine shots into the moving, threatening, forceful, dangerous, and noncompliant suspect car.  (Exhibit 5, 1:14; Exhibit 3, 3:36; Exhibit 1, 6:20).  The suspect car was reversing directly

towards the area Senior Corporal Kimpel and Officer Hopkins had been standing approximately eight seconds earlier.  Senior Corporal Kimpel and Officer Hopkins were still retreating to their right from the reversing suspect car when Officer Hess started firing.  (Exhibit 1, 6:18; Exhibit 3, 3:36).

42.     After Officer Hess fired approximately five shots, Senior Corporal Kimpel fired a single shot into the front passenger door of the suspect car.  (Exhibit 1, 6:24; Exhibit 3, 3:40; Exhibit 5, 1:18).  Ballistics analysis would later show that Senior Corporal Kimpel's single bullet lodged in the front passenger-side door.  (Exhibit 6).  Senior Corporal Kimpel had stopped firing because Officer Hess was in front of him (in his line of fire).  Officer Hess's shots travelled through the front passenger window, some of which struck the Dawes in the driver's seat. Kimpel's single shot did not strike either Occupant.  (Exhibit 6).

43.     After the nine shots from Officer Hess and the single shot from Senior Corporal Kimpel, Dawes again accelerated backwards in a noncompliant, threatening, forceful, dangerous manner.  (Exhibit 5, 1:19).  Officer Hess fired three more times into the suspect car, and the suspect car stopped.

44.     Officer Hopkins sought cover from the suspect car, and yelled, "**HANDS UP**!" (Exhibit 1, 6:26).  Officer Hess loudly called on his radio, "Shots fired, Shots fired! Forty-seven hundred east side back parking lot!" and replied to the radio operator, "Start me an ambulance!" (Exhibit 5, 1:23).  An Officer yells again, "SHOW US YOUR HANDS!" and Officer Hess commanded, "LET ME SEE YOUR HANDS! HANDS UP!"  (Exhibit 5, 1:37).

45.     The passenger-side occupant Rosales finally complied and showed his hands from the front passenger seat.  (Exhibit 5, 1:37).  Another Officer yelled, "HANDS UP!" and Officer

Hess ordered, "OPEN THE DOOR FROM THE OUTSIDE! REACH OUT, OPEN THE DOOR!" (Exhibit 1, 6:45; Exhibit 3, 4:02).

46.     Officer Hess called to dispatch, "Alpha 114, they rammed the squad car twice." (Exhibit 5, 1:48). Senior Corporal Kimpel told Officer Hopkins, "Hey Zach watch yourself man – here, hey fall back, fall back, fall back, fall back." (Exhibit 1, 7:00; Exhibit 3, 4:16). Officer Hopkins was standing in front of Senior Corporal Kimpel, using another car for cover. Officer Hopkins moved and stood next to Senior Corporal Kimpel. (Exhibit 1, 7:00). Officers Hess, Alisch, Evans, and Lickwar were all standing behind the Patrol Vehicle with their weapons drawn on the now stationary suspect car. Senior Corporal Kimpel and Officer Hopkins were standing to the left of the Patrol Vehicle, using a parked truck as cover. (Exhibit 1, 7:00).

47.     Officer Hess ordered passenger Rosales, "OPEN THE DOOR FROM THE OUTSIDE! OPEN THE DOOR FROM THE OUTSIDE!" (Exhibit 5, 1:41). Rosales can be seen in the passenger seat reaching out the now shattered passenger window to open the door. (Exhibit 5, 2:00). An Officer repeats the order, and Officer Hess addresses the other Officers behind him and to his left, "You guys okay? Everybody alright?" (Exhibit 5, 2:26). The Officers all responded in the affirmative. (Exhibit 5, 2:27).

48.     Once Rosales exited the suspect car, Officer Hess commanded him to "WALK ON YOUR KNEES, TOWARDS ME!" (Exhibit 5, 2:48). Rosales was outside the suspect car on his knees, wearing a jacket and with a blanket wrapped around his legs, with his hands raised in the air. (Exhibit 5, 2:54).

49.     Rosales told Officer Hess that his wife Dawes was the only other person in the suspect car. (Exhibit 5, 2:53). Following the Officers' instructions, Rosales walked on his knees towards Officer Hess as Officer Hess slowly approached the suspect car and passenger. (Exhibit

5, 2:53).   The other Officers continued to hold Rosales and the Journey under their cover. (Exhibit 5, 3:03).

50.      Officer Evans and another Officer approached the suspect car behind Officer Hess.  (Exhibit 2, 6:07).  As the Officers moved toward the suspect car, Senior Corporal Kimpel moved behind the Patrol Vehicle.  (Exhibit 3, 5:02).  Evans moved towards the front of the suspect car.  (Exhibit 2, 6:10).  Lickwar covered Rosales (who had not yet been searched incident to his detention).  (Exhibit 4, 6:13).  Officer Hess cleared the suspect car and instructed Officers Evans and Hopkins to keep a gun on Dawes until the ambulance arrived.  (Exhibit 5, 3:21).

51.      As Officer Lickwar handcuffed Rosales, Officer Hess asked Officer Evans if she saw a weapon; she did not see a weapon at that point.  (Exhibit 2, 6:27).  Officer Hess told Dawes that an ambulance was on its way.  Senior Corporal Kimpel went to move a Patrol Vehicle that blocked the east entrance.  (Exhibit 3, 6:08).

52.      Officer Hess asked if Officer Evans had seen any weapons.  (Exhibit 5, 3:59). The Officers indicated they had not seen a weapon Officer Hess then found a holster in the front passenger seat of the suspect car, and alerted the other Officers to be on the lookout for a weapon.  (Exhibit 5, 3:58).  As Officer Hess asked Rosales about any weapons in the suspect car, Officer Hopkins tended to Dawes.  (Exhibit 4, 7:04).  After inspecting Dawes, Officer Hopkins indicated that he was not going to perform CPR because the compressions could pump the blood to the wounds in Dawes's neck.  (Exhibit 1, 9:27).  Officer Hopkins put the suspect car in park. (Exhibit 1 9:49).

53.      Officer Hess then asked the Officers which of them were behind the suspect car when it started reversing.  (Exhibit 5, 4:50 ).  Senior Corporal Kimpel told Officer Hess that he

and Officer Hopkins were behind the suspect car, but they had moved.  (Exhibit 3, 7:12).  Officer Hopkins indicated he was not going to move Dawes (currently in critical condition), because she was still breathing.  (Exhibit 1, 10:13).

54.     An Officer performed a pat-down on Rosales as Officer Hess and Senior Corporal Kimpel let dispatch know that Dawes needed medical attention immediately.  (Exhibit 1, 10:39; Exhibit 3, 7:53).  After a response from dispatch, Officers Hess and Evans told Dawes that the ambulance was on its way.  (Exhibit 2, 8:31).

55.     Officer Evans looked in the passenger seat for a weapon.  (Exhibit 2, 9:19).  Officer Evans pulled a pillow from the front passenger seat, pulled a firearm from behind the center console, and alerted the other Officers that she had found a firearm.  (Exhibit 1, 13:08; Exhibit 2, 10:51).

56.     The firearm was a tan-colored SCCY, CPX-1, 9mm, semi-automatic handgun.  (Exhibit 7).  It was loaded but did not have a bullet in the chamber. The gun had blood on it when Officer Evans placed it in an evidence bag held by Officer Lickwar.  (Exhibit 2, 10:51).  Officer Evans said that the firearm was found with its handle pointed upwards, as if one of the two occupants of the suspect car had placed it upside down. (Exhibit 2, 16:27).

57.     Other Officers arriving later to the scene escorted Senior Corporal Kimpel and Officer Hess into separate Patrol Vehicles and away from the scene.  (Exhibit 5, 7:25; Exhibit 3, 13:35).  Eventually, all Officers would be separated.

58.     Dawes was transported to the Hospital, where she later died as a result of her wounds.

59.     The suspect car was full of random personal items, including: a box for a 40" television, a small tv, a computer modem and a box for a laptop computer.  (Exhibit 8).

60.     Dawes's autopsy report indicated that she had controlled/illegal drugs in her system, including amphetamine, methamphetamine, diphenhydramine, morphine, codeine, and 6-monoacetylmorphine.  (Exhibit 9).  Rosales was treated for his abrasions and transported to the Dallas Police Department.  (Exhibit 10).

61.     The handgun recovered from the suspect car was stolen out of Duncanville. (Exhibit 11).  Rosales was held on a charge of unlawful possession of a firearm.

## IV.     LEGAL STANDARD FOR DISMISSAL

62.     Senior Corporal Kimpel moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. FED. R. CIV. P. 12(b)(6).   A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement . . . showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The claim must include enough factual allegations "to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

63.     Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  The Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff.  *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief

above the speculative level." *Twombly*, 550 U.S. at 555; *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

64.     "The Supreme Court recently expounded upon the *Twombly* standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gonzalez*, 577 F.3d at 603 (quoting *Iqbal*, 556 U.S. at 677–78).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief.'" *Id*. (internal quotations omitted).

65.     In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.  First, the Court identifies and disregards conclusory allegations, because they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680  Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*.  "'This standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (quoting *In re So. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008)).  This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## V.   PLAINTIFFS' CLAIMS AGAINST SENIOR CORPORAL KIMPEL FAIL AS A MATTER OF LAW.

### A.   PLAINTIFFS CANNOT STATE A CLAIM FOR EXCESSIVE FORCE AGAINST SENIOR CORPORAL KIMPEL.

66.    To bring a claim under 42 U.S.C. § 1983, Plaintiffs must state a violation of the United States Constitution or Federal Law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

67.    To state a claim for excessive force in violation of the Constitution, a plaintiff must allege "'(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'"  *Peterson v. City of Fort Worth*, 588 F.3d 838, 846 (5th Cir. 2009) (quoting *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006)).  Reasonableness is an objective standard viewed from "'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

68.    An Officer's use of deadly force to apprehend someone suspected of a criminal offense "is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also Graham,* 490 U.S. at 395; *Brown v. Faison,* No. 6:04-CV-016-C, 2005 WL 473681, at *3–4 (N.D. Tex. 2005) (citing *Graham,* 490 U.S. at 395).  Objective reasonableness is a matter of law for the courts to decide.  *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999).

69.    To determine objective reasonableness, the Court must balance the amount of force used with the need for force, while considering the "totality of the circumstances" and "paying careful attention to the facts and circumstances of each particular case."  *Ramirez v. Knoulton*, 542 F.3d 124, 128–29 (5th Cir. 2008) (citing *Flores v. City of Palacios,* 381 F.3d 391, 393 (5th Cir. 2004)).  "[T]he need for force determines how much force is constitutionally permissible."  *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (citing *Ikerd v. Blair*, 101 F.3d

430, 434–35 (5th Cir. 1996)).   Thus, an Officer's use of deadly force is reasonable when a "credible, serious threat to the physical safety of the officer or to those in the vicinity" exists. *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).

70.     The Court must view the Officer's actions "in light of the facts and circumstances confronting [the Officer], without regard to [the Officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397; *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382–83 (5th Cir. 2009); *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004); *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

71.     Critically, reasonableness must allow for the fact that Officers are often "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation."   *Hathaway*, 507 F.3d at 320–21 (quoting *Graham*, 490 U.S. at 396–97); *Ramirez*, 542 F.3d at 129.   Thus, the Court must consider the Officer's actions from "the perspective of a reasonable officer on the scene," not with the 20/20 hindsight.   *Ramirez*, 542 F.3d at 129.   The Fifth Circuit Court of Appeals has admonished:

> [W]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.   What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Stroik v. Ponseti*, 35 F.3d 155, 158–59 (5th Cir. 1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

72.     Factors the Court should consider include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Graham*, 490 U.S. at 396.

73.     There is no dispute that Senior Corporal Kimpel used deadly force in response to the imminent danger to himself and the other Officers presented by Dawes as she attempted to flee the scene in her stolen vehicle.  However, Senior Corporal Kimpel only did so in authorized response to a "credible, serious threat" to the safety of himself and the other Officers on foot at the scene.  Dawes intentionally rammed a Police Vehicle, attempted to ram through a fence, and backed up towards the Officers in open defiance of the Officers' clear orders to stop and show her hands.

74.     Senior Corporal Kimpel was faced with the noncompliant driver of a stolen car openly defying Officers' orders to stop and recklessly attempting to flee the scene, even trying to drive through a fence.  In response to the escalating situation created by the repeatedly non-compliant suspect driver, Senior Corporal Kimpel correctly made a split-second decision to use deadly force to stop the car as it approached to protect himself and those involved/nearby; particularly Officer Hopkins, who Senior Corporal Kimpel thought was still standing directly in the path the oncoming stolen car.  *See Hathaway*, 507 F.3d at 320–21.

75.     Viewing Senior Corporal Kimpel's actions from "the perspective of a reasonable officer on the scene," Senior Corporal Kimpel acted with objective reasonableness when he shot into the car to stop the threat.  *See Ramirez*, 542 F.3d at 129.  Given Senior Corporal Kimpel's reasonable use of deadly force to protect himself, Officer Hopkins, and the other Officers in the vicinity, Plaintiffs cannot state any constitutional violation.  Consequently, Plaintiffs' claims fail under 42 U.S.C. § 1983 and should be dismissed with prejudice.

B.   **PLAINTIFFS' FEDERAL CLAIMS AGAINST SENIOR CORPORAL KIMPEL ARE BARRED BY QUALIFIED IMMUNITY.**

76.   To establish liability against Senior Corporal Kimpel, *Plaintiffs* bear the burden of negating his Qualified Immunity Defense.  *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

77.   Qualified Immunity is meant to give Officers "breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Thus, the Court employs a two-part test to analyze a Qualified Immunity Defense.  First, the Court must determine whether Plaintiffs allege a violation of a "clearly established" constitutional right.  *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004); *see also Saucier*, 533 U.S. at 201.  Second, the Court must determine whether Senior Corporal Kimpel's conduct was "objectively unreasonable."  *Collins*, 382 F.3d 529 at 537.  The Court may consider the two prongs of the Qualified Immunity analysis in either order.  *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

78.   Even if a governmental official violated the Constitution, the official is nonetheless entitled to immunity if his or her conduct was "objectively reasonable" in light of "law which was clearly established at the time of the disputed action."  *Id.*; *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).  This means that the official's conduct is objectively reasonable "unless *all* reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution."  *Gates v. Tex. Dep't of Protective & Regulatory Servs.,* 537 F.3d 404, 419 (5th Cir. 2008) (emphasis added).  "When properly applied, [Qualified Immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

79.     Plaintiffs have not, and cannot, state a claim that Senior Corporal Kimpel violated a clearly established constitutional right.   Regardless, as previously stated, Senior Corporal Kimpel's actions were objectively reasonable under the circumstances.  *See Hathaway*, 507 F.3d at 320–21.

80.     Courts have consistently held that an Officer has Qualified Immunity for his use of deadly force against suspects fleeing in a motor car in close proximity to the Officer and others.  *See e.g.*, *Hathaway*, 507 F.3d at 322; *Sanchez v. Edwards*, 433 Fed. App'x 272, 276 (5th Cir. 2011) (per curiam); *Wright v. City of Garland*, 2014 U.S. Dist. LEXIS 159703, *32 (N.D. Tex. Nov. 13, 2014); *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005); *but see Lytle v. Bexar County Tex.*, 560 F.3d 404, 408, 418 (5th Cir. 2009) (dismissing interlocutory appeal from denial of summary judgment on evidence indicating fleeing suspect may have been "three or four houses" down the street when the Officer shot).

81.     In *Hathaway*, the Fifth Circuit held that an Officer had Qualified Immunity for using deadly force to prevent the driver of a car from hitting the Officer.  *Hathaway*, 507 F.3d at 322.  Officer Steven Bazany was on foot patrol in downtown San Antonio, Texas, when an off-duty sheriff's deputy reported a possible gang altercation nearby.  *Id*. at 315.   Officer Bazany walked to the nearby intersection in question and observed a car at the intersection with the doors open, and a group of men gathered around another car in a threatening manner.  *Id*.  As Officer Bazany approached, the men got back into the car and proceeded through the intersection; Officer Bazany motioned for them to pull over.  *Id*. at 315–16.  After the car stopped, Officer Bazany approached the car from the front.  *Id*. at 316.  When he was approximately eight to ten feet in front of the car, the car accelerated towards him.  *Id*.

82.     Officer Bazany attempted to get out of the way of the approaching car, but quickly realized that he could not; and fired his weapon, killing the driver.  *Id*.  The car hit Officer Bazany's leg, and Officer Bazany was not sure whether he fired before, during, or after he was struck.  *Id*.  However, the bullet entered the driver below his left shoulder blade, thus indicating the car might have been beside Officer Bazany when he shot.  *Id*.

83.     The driver's family sued.  *Id*.  On appeal from summary judgment for Officer Bazany, the Fifth Circuit affirmed summary judgment and held that "[p]roximity and temporal factors" are relevant in cases involving suspects fleeing in motor cars.  *Id*. at 321 (citing *Waterman*, 393 F.3d at 477 (holding that Officers' use of deadly force justified when suspect's car "lurched" toward the Officers, even though the Officers were not directly in the car's path)). The court reasoned that "[g]iven the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force."  *Id*. at 322. (citing *Graham*, 490 U.S. at 396–97).  Thus, the court would not second-guess Officer Bazany's split-second decision to shoot into the oncoming car.[2]  *Id*.

84.     The Fourth Circuit held in *Waterman* that a driver's "lurching" toward Officers up to seventy-two feet away was sufficient to justify the Officers' use of deadly force.[3]  *Waterman*, 393 F.3d at 480.  After police observed Waterman speeding, a 10-minute pursuit ensued.  *Id*. at 473.  The pursuit ended a tunnel toll plaza when traffic ahead of Waterman slowed.  *Id*. at 474.

---

[2] The Fifth Circuit also upheld two Officers' Qualified Immunity in *Sanchez*, 433 Fed. App'x at 275.  The Officers were surveilling a house involved in suspected illegal drug activity, when a car entered the driveway of an adjacent house.  *Id*. at 273.   The Officers, wearing clothing identifying them as police, approached the car, identified themselves as police, and ordered the driver to stop the car.  *Id*.   The driver reversed the car into the street, and both Officers shouted for him to stop and followed the car into the street.  *Id*.   When the driver put the car in drive and accelerated toward one Officer, both Officers, who were within feet of the car, fired their service weapons into the car.  *Id*. at 273–74, 276.   The driver died at the scene.  *Id*.   On appeal from summary judgment for the Officers, the Fifth Circuit followed *Hathaway* and held that Officers' use of deadly force was reasonable, given the limited time the Officers had to respond and the proximity of one Officer to the path of the car.  *Id*. at 275.   The court noted that the driver had ignored numerous commands from the Officers to stop, that one Officer was in front of the car when it advanced, and that both Officers' close proximity to the car left them with a short time to react.  *Id*.   (contrasting the facts with those in *Lytle* in which an Officer shot at a fleeing car as much as three to four houses away).
[3] *Waterman* was cited favorably by the Fifth Circuit in *Hathaway*, 507 F.3d at 321.

Waterman slowed to approximately eleven miles per hour as he approached the plaza, and four Police Officers, who were warned of the pursuit, took positions in the plaza with guns drawn. *Id*. The Officers were from sixteen to seventy-two feet from the front of Waterman's car, and no Officer was directly in the car's path. *Id*. at 474–75.

85.     As the Officers took their positions, Waterman briefly accelerated. *Id*. When he did so, the Officers observed the car "lurch." *Id*. The Officers perceived this as Waterman beginning a run at them, and they fired into Waterman's car. *Id*. at 475. Waterman never exceeded fifteen miles per hours as he continued through the toll plaza, past the Officers. *Id*. As he passed through the toll plaza, Waterman avoided the Officers by several feet, and stopped briefly behind a vehicle in front of him. *Id*. The Officers continued to fire after Waterman passed through the toll plaza, firing eight rounds. *Id*. Waterman died from his injuries sustained in the encounter. *Id*.

86.     On appeal from the district court's denial of the Officers' motion for summary judgment, the Fourth Circuit held that no reasonable jury could conclude that the Officers' perception that Waterman posed a threat of serious physical harm when his car "lurched" was unreasonable. *Id*. at 477. Specifically, the court held that when Waterman's car lurched forward, the Officers had to "immediately decide whether Waterman was attempting to assault the officers ahead of him or whether he intended only to drive by them, leaving them unharmed." *Id*.

87.     To the extent the Officers had time to ponder the facts, the Court opined they would have considered that Waterman was not acting rationally in leading police on a 10-minute chase; that he was not stopping despite seeing Officers ahead with guns drawn; that he was accelerating in the Officer's general direction; and that Waterman had allegedly attempted to run

an Officer off the road during the pursuit. *Id*. at 477–78. The Court also noted counter-factors such as: Waterman had not driven recklessly in the twenty-seven seconds after he exited the tunnel; there was no visible damage to Waterman's car; there was no evidence Waterman had committed a serious crime before allegedly attempting to run an Officer off the road; and Waterman never accelerated past fifteen miles per hour or directed his car at the Officers. *Id*.

88.     After noting these possible factors, the Court pointed out the "critical reality" that the Officers did not have time to perform this calculus. *Id*. Rather, the instant Waterman's car "lurched," it could have reached the Officers within a second. *Id*. Thus, the Officers "risked their last chance to defend themselves" if they "paused for even an instant." *Id*. Consequently, the court held that the Officers were entitled to Qualified Immunity for the shots fired as the car approached. *Id*. at 480.

89.     Likewise, in *Wright*, this Court held that an Officer who fired into a car's passenger window to stop a fleeing suspect had Qualified Immunity from suit. *Wright*, 2014 U.S. Dist. LEXIS 159703 at *33. In the early hours of a Saturday, Officers were investigating a party at an apartment complex in Garland, Texas, in which they believed juveniles were drinking and using marijuana. *Id*. at *2. Officer Stallings was searching the complex for two juveniles who had fled the scene when he heard a car horn at the entrance to the complex. *Id*. Officer Stallings suspected it might be someone coming to pick up the juveniles who had fled, so he approached the car. *Id*. at *2–3.

90.     According to the driver, Officer Stallings approached the car with his handgun-mounted flashlight shining through the open passenger window. *Id*. Officer Stallings contended that he shined his flashlight in the windshield as he crossed in front of the car to question the driver. *Id*. at *3–4. Within seconds of Officer Stallings shining the flashlight into the car, the

driver accelerated the car toward Officer Stallings.  *Id*. at *4.  Officer Stallings, who claimed to be ten to twenty feet from the front of the car, reacted by firing five shots into the car within a two-second interval.  *Id*.  Two shots entered through the open passenger window and struck the driver, and three shots struck the rear window of the car.  *Id*. at *4, 25–26.  The driver managed to exit the complex, but was apprehended two miles away when he lost control of the car.  *Id*. at *4.

91.     In the driver's suit against Officer Stallings, the Officer moved for Summary Judgment on his Qualified Immunity defense.  *Id*. at *16.  Officer Stallings argued that he thought the driver intend to hit him when the car quickly accelerated.  *Id*. at *21.  He further claimed that his reaction to fire five shots in rapid succession was "a normal and trained response to what he reasonably perceived to be an imminent and deadly threat."  *Id*.

92.     The Court found that surveillance video corroborated Officer Stallings's version of the facts, and that the entire encounter took approximately two seconds.  *Id*. at *22, 28–29. The Court found further that Officer Stallings had only seconds to react to the driver's action, and the fact that Officer Stallings could have avoided the car by stepping backward did not change the conclusion that Officer Stallings actions were objectively reasonable.  *Id*.  at *30–31. The Court also declined to second guess Officer Stallings by analyzing his actions in a "theoretical, sanitized world of our imagination," and held that the three shots Officer Stallings fired into the rear window of the car did not change the Court's analysis.  *Id*. at *31 (quoting *Stroik v. Ponseti*, 35 F.3d 155, 158–59 (5th Cir. 1994)).  The Court granted Officer Stallings's motion for summary judgment.  *Id*. at *32.

93.     As these cases demonstrate, an Officer who is in close proximity to an oncoming car driven by a fleeing suspect may respond with deadly force.  In all three cases, Officers found

themselves in danger by a car driven by a noncompliant driver. *See Hathaway*, 507 F.3d at 316; *Waterman*, 393 F.3d at 474–75; *Wright*, 2014 U.S. Dist. LEXIS 159703 at *4.   Likewise, Dawes had not responded to the Officers' repeated attempted to contact her and Rosales.   Officer Bazany was eight to ten feet from the car in *Hathaway*, 507 F.3d at 316; the Officers in *Waterman* were sixteen to seventy-two feet of the advancing car, 393 F.3d at 474–75; and Officer Stallings was between ten and twenty feet from the car in *Wright*, 2014 U.S. Dist. LEXIS 159703 at *25–26.   Here, Senior Corporal Kimpel was within feet of Dawes's car as it reversed past Officer Hess.   Moreover, Senior Corporal Kimpel had passed in front of Officer Hopkins to move out of the car's direct path only seconds before it advanced on him.   Thus, he reasonably thought that Officer Hopkins was still only a few feet from the car, directly in the car's path. (Exhibit 1, 6:12).   In all three cases, the driver accelerated toward the Officers unexpectedly, and the encounter was over in seconds.   *See Hathaway*, 507 F.3d at 316; *Waterman*, 393 F.3d at 474–75; *Wright*, 2014 U.S. Dist. LEXIS 159703 at *4.   Here, only ten seconds transpired from the time Dawes put the car into reverse and backed into Officer Hess's Police Vehicle until she rammed the fence and backed toward Senior Corporal Kimpel and Officer Hopkins.   (Exhibit 1, 6:02–6:12).   In *Waterman*, the car never exceeded fifteen miles per hour during the encounter, and merely "lurched" toward the Officer before the Officers began firing on it.   *Waterman*, 393 F.3d at 474–75.   This was sufficient for the Officers to reasonably perceive a serious threat of physical harm because the car could have reached the Officers within a second had the driver accelerated.   *Id*. at 477–78.   Likewise, Dawes's slow-speed reversal toward Senior Corporal Kimpel and Officer Hopkins was sufficient for Senior Corporal Kimpel to perceive a serious threat of physical harm in light of Dawes's prior noncompliance with Police commands, hitting

Officer Hess's Police Vehicle, and then ramming the fence in an apparent attempt to flee the scene in a stolen car rather than comply with Police commands.

94.    Senior Corporal Kimpel's split-second decision to fire into Dawes's car to neutralize the "credible, serious threat" was objectively reasonable in the totality of the circumstances. *See Hathaway*, 507 F.3d at 320. The Officers initially attempted a peaceful "stop" of the stolen car. Unable to see inside of the car because of the fogged windows, the Officers reasonably approached the stolen car with caution. They announced their presence, shined flashlights into the car, and attempted to open the doors. Unable to gain access, but discovering that the stolen car was occupied, the Officers fell back and continued to attempt to contact the occupants. Neither occupant ever responded to the Officers' command or contacted the Officers in anyway.

95.    Instead, and with no warning, Dawes started the stolen car and backed it into Officer Hess's Police Vehicle. (Exhibit 1, 6:02). When she could proceed no further, Dawes threw the stolen car into drive and sped forward, apparently attempting to ram through the fence in front of the car. (Exhibit 1, 6:02). The fence flexed under the weight of the car, but did not give way. (Exhibit 1, 6:09). When Dawes could not evade capture through the fence, she paused momentarily, put the stolen car into reverse, and advanced on Senior Corporal Kimpel and Officer Hopkins. (Exhibit 1, 6:10).

96.    Senior Corporal Kimpel found himself between Officer Hopkins and the threatening car. He needed to move. Cautious of Officer Hopkins's line of fire, he told Officer Hopkins, "Watch out, watch out, watch out, watch out" as he moved to his right. (Exhibit 1, 6:12). With eyes fixed on the advancing car, Senior Corporal Kimpel did not see whether Officer Hopkins managed to move from the car's path. Regardless, he was still in danger

because once Dawes cleared Officer Hess's Police Vehicle, she could quickly put the stolen car in drive and advanced on Senior Corporal Kimpel and the other Officers within seconds.  *See Waterman*, 393 F.3d at 477–78.

97.      After observing the occupants of the stolen car repeatedly ignore the Officers' commands, attempt to flee the scene by hitting the Police Vehicle and ramming the fence, Senior Corporal Kimpel reasonably perceived that Officer Hopkins was in present danger as he stood in the path of the advancing car.  Likewise, Senior Corporal Kimpel reasonably perceived that the car presented a serious threat of physical harm to himself and the other Officers should it pass Officer Hess's Vehicle and accelerate toward the Officers standing between it and the only exit.  Thus, Senior Corporal Kimpel made the split-second decision to stop the car with deadly force.

98.      In light of controlling case precedent, Plaintiffs have not, and cannot, state a claim that Senior Corporal Kimpel violated a clearly established constitutional right.  *See Gates*, 537 F.3d at 419.  Furthermore, Senior Corporal Kimpel's decision was objectively reasonable in the totality of the circumstances, and this Court should dismiss Plaintiffs' § 1983 claims accordingly.  *See  Peterson*, 588 F.3d at 846.

## C.   PLAINTIFFS' STATE-LAW CLAIMS AGAINST SENIOR CORPORAL KIMPEL FAIL AS A MATTER OF LAW.

99.      Plaintiffs also assert pendent state-law tort claims of wrongful death and survival against Senior Corporal Kimpel.  (Doc. 11 pp.20–21 ¶¶ 92–101).  However, Plaintiffs cannot meet one element of their wrongful death claim, both claims are barred by the Texas Tort Claims Act, and Plaintiffs cannot overcome Senior Corporal Kimpel's official immunity.

100.     It is undisputed that Senior Corporal Kimpel fired only one shot at the suspect car driven by Dawes.  The forensic evidence shows that this shot did not enter the car's passenger cabin, but lodged in the passenger-side door frame.  Because Senior Corporal Kimpel's shot did

not strike Dawes, Plaintiffs cannot prove one element of their wrongful death claim against Senior Corporal Kimpel.

101.     Under the Texas Wrongful Death Act, a person is only "liable for damages arising from an injury that causes an individual's death."  Tex. Civ. Prac. & Rem. Code § 71.002 (West 2017).  Consequently, "the Act authorizes claims only for actions that actually *cause* death." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 404 (Tex. 1993).

102.     Senior Corporal Kimpel's single shot did not even enter the suspect vehicle's cabin, much less strike and kill Dawes.  Consequently, Plaintiff's wrongful death claim against Senior Corporal Kimpel must be dismissed with prejudice.  *See id.*

103.     Regardless, Tex. Civ. Prac. & Rem. Code § 101.106(f) bars both state-law claims against Senior Corporal Kimpel as an individual Defendant because Plaintiffs' state-law claims could have been brought, and were brought, against the City of Dallas, Senior Corporal Kimpel's employer.  Section 101.106(f) provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.   On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106(f) (West 2017).

104.     The Texas Supreme Court has held that Section 101.106(f) is not limited to those causes of action for which the State has waived immunity.  *Franka v. Velasquez*, 332 S.W.3d 367, 385 (Tex. 2011).  Rather, Section 101.106(f) demands dismissal of any suit brought against a government employee in his individual capacity, with the exception of an employee acting *ultra vires*.  *Id.* at 382 n. 69 (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex.

2009), holding the *ultra vires* exception does not affect immunity for discretionary acts, but requires the plaintiff to plead and prove the employee "acted without legal authority or failed to perform a purely ministerial act").

105.    It is beyond debate that Senior Corporal Kimpel was acting within his official discretion when he decided to use deadly force on the night in question.  *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994) (citing *Vasquez v. Hernandez*, 844 S.W.2d 802, 804–05 (Tex. App.—San Antonio 1992, writ dism'd w.o.j.), holding that officer's positioning himself next to his patrol car with gun drawn and then firing was a discretionary use of deadly force).  And Plaintiffs have not, and cannot, allege that Senior Corporal Kimpel acted without legal authority.  Consequently, the Court must dismiss Plaintiffs' state-law claims against Senior Corporal Kimpel.  *See Franka*, 332 S.W.3d at 385; Tex. Civ. Prac. & Rem. Code § 101.106(f).

106.    Furthermore, even if Plaintiffs had not irrevocably elected to proceed only against the City of Dallas, Senior Corporal Kimpel asserts his Official Immunity, contending that the reasoning set forth above as applied to Qualified Immunity, would also bar Plaintiffs' state-law claims.  Official immunity precludes liability when (1) a government official or employee, (2) is sued for performing a discretionary governmental act, (3) the act was performed in good faith, (4) the act was within the scope of the defendant's authority, and (5) the individual was sued in their individual capacity.  *Harless v. Niles*, 100 S.W.3d 390, 395–96 (Tex. App.—San Antonio, 2002, no pet.).

107.    It is Plaintiffs' burden to defeat the Official Immunity defenses.  *Chambers*, 883 S.W.2d at 653.  As with federal Qualified Immunity, the burden to overcome Official Immunity is high.  Official Immunity applies an objective standard that is "substantially derived from the test for good faith in a qualified immunity claim for federal constitutional violations."  *Murray v.*

*Earle*, 405 F.3d 278, 294 (5th Cir. 2005).  Similar to the test for Qualified Immunity, Official Immunity applies if "a reasonably prudent official might have believed that his action was appropriate under the circumstances," even if the actions were taken negligently.  *Id.*; *see also Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426 (Tex. 2004).

108.    The only element in dispute is whether Senior Corporal Kimpel acted in good faith—element (3).  As discussed above, the evidence demonstrates the objective reasonableness and good faith of Senior Corporal Kimpel's actions in this case.  Thus, the Court should dismiss Plaintiffs' state-law claims against Senior Corporal Kimpel with prejudice.  *See Chambers*, 883 S.w.2d at 653.

## VI. ALTERNATE REQUEST FOR A REPLY PURSUANT TO FED. R. CIV. P. 7(A)

### A.    OVERVIEW OF PLAINTIFFS' CLAIMS

109.    As set forth in the foregoing sections of this brief, Plaintiffs fail to plead sufficient facts to establish any of their claims against Senior Corporal Kimpel.  Plaintiffs certainly have not pleaded sufficient facts to penetrate Senior Corporal Kimpel's immunity.  However, in the event the Court allows Plaintiffs an opportunity to proceed with the case, Plaintiffs should be required to provide adequate descriptions that not only meet the standards of *Iqbal*, but that would also show that Senior Corporal Kimpel's Immunity Defenses would fail, if Plaintiffs' factual allegations are taken as true.

### B.    REQUIREMENTS FOR FACTUALLY SPECIFIC ALLEGATIONS

110.    The Fifth Circuit Court makes it clear that the Immunity Defense should be resolved at the earliest stages.  *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995); *Backe v. LeBlanc*, 691 F.3d 645, 648-649 (5th Cir. 2012) (citing *Lion Boulos v. Wilson*, 834 F.2d 504, 507-508 (5th Cir. 1987)); *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014).  The United States Supreme Court also approves of the same procedure.  *Crawford-El v. Britton*, 523 U.S.

574, 597–598 (1998).  When a Public Official, such as Senior Corporal Kimpel, has pleaded the affirmative defense of Immunity in his Answer, the District Court should require the Plaintiffs to reply to that defense in detail.  By definition, a Reply pursuant to FED. R. CIV. P. 7(a) must be tailored to the assertion of Qualified Immunity and fairly engage Senior Corporal Kimpel's allegations.  *Schultea*, 47 F.3d at 1433.

## C.  SENIOR CORPORAL KIMPEL'S SPECIFIC FACTUAL ASSERTIONS OF IMMUNITY

2.  Senior Corporal Kimpel has asserted his immunity defense with great factual specificity as set forth in paragraphs 3.01–3.20 of his *Answer* as follows (Doc. 26):

> 3.01    Pursuant to the procedure set forth in *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995) and *Backe v. LeBlanc*, 691 F.3d 645, 648-649 (5th Cir. 2012), Senior Corporal Kimpel sets forth factually specific assertions regarding his Qualified Immunity Defense.  *See Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014); *see also Lion Boulos v. Wilson*, 834 F.2d 504, 507-8 (5th Cir. 1987).  The United States Supreme Court approves this procedure.  *Crawford-EL v. Britton*, 523 U.S. 574, 597-598 (1998).    In connection with this, Senior Corporal Kimpel specifically requests that the Court require Plaintiff to file a Reply pursuant to Federal Rule of Civil Procedure 7(a).  Plaintiffs must plead factual allegations that, if true, show on their face not only a plausible right to relief but also that Senior Corporal Kimpel is not entitled to Qualified Immunity under his specific factual assertions. Plaintiffs must address these factual assertions.

> 3.02    Senior Corporal Kimpel asserts the following facts supporting his entitlement to Qualified Immunity:

> 3.03    On January 18, 2017, Dallas Police Department Dispatch sent uniformed Police Officers to respond to a report of a suspicious suspect car at the apartment complex rear parking lot located at 4700 Eastside Avenue.  The Officers were informed via radio and the call sheet that the suspect car was a Dodge Journey that was reported stolen out of Irving.

> 3.04    Six Officers were initially sent to the location. Officers Zachary Hopkins and Officer Christopher Alisch were first on scene at the apartment complex. While en-route, Hopkins and Alisch discussed the best method to approach the stolen/suspect car in the crowded parking lot. They located the Dodge Journey ("suspect car") in the east corner of the rear parking lot.  Hopkins circled around to the Northwest of the suspect car, facing the rear of the suspect car. The parking lot was dimly lit by overhead lights in the row of parking spaces to the northeast of the suspect car.

3.05    Hopkins radioed to Officers Peter Lickwar and Erin Evans to join him on foot. Evans and Lickwar parked their Patrol Vehicle to block the far north entrance to the parking lot, and walked south towards Hopkins and the suspect car.

3.06    Hopkins radioed that they were going to conduct a Felony/High Risk stop on the stationary suspect car: "Alpha 152 we're gonna go ahead and do a felony stop."

3.07    Officers Christopher Hess and Senior Corporal Jason Kimpel pulled to the rear parking lot behind Hopkins's and Alisch's Patrol Vehicle, and exited towards the south corner. The Patrol Vehicles were blocking that southernmost entrance to the rear parking lot. Kimpel joined Hopkins and Evans on the Southeast fence line. The Dallas Officers were the only persons using flashlights at all times relevant to this litigation.

3.08    As Evans and Lickwar approached from the north, Hopkins yelled towards the suspect car: "**Driver! Driver! Put your hand out the window!**"  Hopkins and Alisch were shining their flashlights at the suspect car. All officers on scene were wearing Dallas Police uniforms that clearly identified them as Police Officers. Most of the Officers were using flashlights for illumination and identification. Evans positioned herself to Hopkin's left along the southeast fence line.

3.09    Hopkins stated to Alisch: "I don't even know if it's occupied right now." The Officers were beaming their flashlights at the suspect car.  Hopkins yelled: "**Driver! Put your hands out the window!**"  Hopkins: "Nope - I can't even tell if it's occupied still.  We are just gonna move up on it. Yes? No?"

3.10    Officer Hess tells the other Officers that he is going to pull the Police Vehicle behind the suspect car. Kimpel then says towards Hopkins: "Hey - I'm gonna guess it's not occupied." Hopkins responded: "well, the last comment was a male and a female inside." Evans: "It's got foggy windows."  The Officers had trouble seeing inside the suspect car because of the condensation on the windows.

3.11    The six Dallas Officers approached the suspect car as Officer Hess moved a Patrol Vehicle within approximately 10-15 feet of the suspect car.  The Patrol Vehicle faced the rear passenger side of the suspect car at an angle. The Vehicle had its headlights and overhead spotlight on the suspect car in further illumination/identification, but did not activate the emergency lights. Officers would later indicate that engaging the emergency flashers would have made it more difficult to see inside the suspect car.  Approximately one (1) minute had elapsed since Dallas Police first made contact with the suspect car -  there had been no response and/or compliance from the Occupants and the suspect car.

3.12    Senior Corporal Kimpel moved towards the Patrol Vehicle as it approached the suspect car. As Hess pulled the Vehicle into position, he sounded the emergency siren and the loud air horn to identify the Dallas Officers. Hopkins moved next to the Patrol Vehicle's front driver-side door. After parking, Hess again sounded the Patrol Vehicle's loud air horn for identification.

3.13    An Officer is heard: "I can't tell if there's anybody in there." Hopkins asked Officer Lickwar: "Peter [Lickwar], can you see anybody?" The Officers still were shining their flashlights into the suspect car. Lickwar (Peter) was the closest to the front passenger door, looking from behind a white van parked adjacent to the Suspect car.  Lickwar responded: "Not from here."

3.14    Hopkins: "Let's just move up."  Officers Hopkins, Evans and Kimpel slowly approached the suspect car from the north (from behind), coming within an arm's length of the suspect car and in front of the Patrol Vehicle.  All Officers had their guns drawn and were illuminating/flooding the suspect car with their handheld flashlights.

3.15    Officer Hopkins reached for the rear passenger-side door and pulled the handle, it was locked.  He quickly retreated a few feet to the rear of the Suspect car.  An Officer can be heard stating: "It's occupied, it's occupied, they were sleeping."  Approximately one minute thirty-nine seconds (1:39) had elapsed since Dallas Police first contacted the suspect car, with no response/compliance. Approximately thirty-eight seconds (0:38) had elapsed since Hess had sounded the emergency siren and air horn within feet of the Suspect car, again with no response/compliance.

3.16    An Officer shouted to the suspect car: "**Let me see your hands!**" Lickwar reacts to this call by retreating from his position near the front of the suspect car and towards the Patrol Vehicle. Hopkins commanded: "**Hands up!**" Another Officer loudly added (again): "**Let me see your hands!**"

3.17    Hopkins attempted to open the rear hatch on the suspect car, but it was also locked.  Hopkins and Kimpel retreated a few more steps until they could see the driver side of the suspect car. Kimpel mentioned to Hopkins: "There's a bunch of s*** back there." Separately, Evans tells Hess: "I can't see s***."

3.18    Hess yells to the suspect car: "**Get your hands up, open the door!**" Another Officer adds: "**Dallas Police!**"  Kimpel asked the group: "What do you think?"

3.19    The Officers stood in a semicircle around the rear of the suspect car with their guns drawn and their handheld flashlights pointing at/in the suspect car.  The Patrol Vehicle's front headlights and overhead lights also illuminated the suspect car.

3.20    Lickwar yelled: "**Dallas Police! Show me your hands!**"  An individual can be seen moving inside the suspect car.  Kimpel: "He's movin' in there now." Lickwar: "**Show me your hands!**"  Another Officer shouted: "**Put your hands outside the suspect car right now!**"

3.21    Senior Corporal Kimpel alerted the Officers to the movement inside the Suspect car: "Somebody's moving around in the back."  This information caused a noticeable change in the Officers' behavior. The Officers, at the rear of the suspect car, retreated a few steps towards the front driver-side corner of the Patrol Vehicle.  Approximately two minutes and twenty-six seconds (2:26) had elapsed since Dallas Police first contacted the suspect car, without any response or compliance from the Occupants. Approximately one minute twenty-four seconds (1:24) had elapsed since Hess had sounded the emergency siren within feet of the suspect car, without any response or compliance from the Occupants.

3.22    Hess screamed at the Occupants: "**Hands UP!**"  Hopkins warned Kimpel to back up: "come on Kimpel, back a little bit…let's at least get this car right here because they got that car." Kimpel joined the retreat of Officers, and stopped facing the rear of the suspect car across the parking lot. He and Hopkins stood well in front of a support beam for the covered parking structure to their northeast (behind them as they faced the suspect car). Kimpel and Hopkins were not behind cover.

3.23    At this point, still without responding to or complying with the Officers' loud verbal commands, Plaintiff engaged the suspect car's engine. Approximately two minutes and forty-two seconds (2:42) had elapsed since Dallas Police first made contact with the suspect car, without response or compliance. Approximately one minute and forty-one seconds (1:41) had elapsed since Hess had sounded the emergency siren and air horn within feet of the suspect car, without response or compliance.

3.24    Lickwar yelled louder this time: "**LET ME SEE YOUR HANDS!**" Kimpel finished his retreat to the position in front of the support beam behind the Suspect car. Kimpel turned on a strobe effect on his flashlight for a few seconds and then switched back to a straight beam.  Upon the suspect car starting its engine, Evans took a position behind the Patrol Vehicle.  Hess stepped into the Patrol Vehicle, saying "S***," (the door remained open) and pulled forward until the cruiser's bumper was behind the rear passenger-side corner of the suspect car. Hess warned the other Officers of his actions, saying "watch out" and "move, move, move."  Lickwar was positioned on the passenger side of the Patrol Vehicle.

3.25    The suspect car's rear tail lights showed white, indicating that it had been put in reverse. As Hess pulled the Patrol Vehicle forward and completely stopped, the driver-side Occupant/Dawes reversed the suspect car and turned her wheel hard to the right. The suspect car's rear end moved toward and hit the front of the

Patrol Vehicle. The suspect car's rear bumper scraped/crunched against the front of the Patrol Vehicle. Hess was still in the Patrol Vehicle at that time with the driver door open. The act was done intentionally and without regard to the Officers/persons in the area. Again, Lickwar commanded: "**SHOW ME YOUR HANDS, NOW!**" Hess shouted: "**SHOW ME YOUR HANDS!**"

3.26   The driver-side Occupant/Dawes pulled the car forward as Hess exited the Patrol Vehicle. The driver-side Occupant/Dawes placed the suspect car in drive; and, it's rear bumper made a scraping sound as it separated from the front end of the Patrol Vehicle.  At this time, Kimpel and Hopkins were along the southeast fence line, directly behind the parking space from which the suspect car was first parked/located.  Evans and another Officer can be seen behind the Patrol Vehicle.

3.27   Hopkins and Kimpel appeared on Evans's body camera to stand squarely in the path of where the suspect car would reverse.

3.28   The suspect car accelerated forward to ram through the white lattice fence in front of her. The act was done intentionally and without regard to the Officers/persons in the area.  Plaintiff accelerated towards and rammed the fence without any indication that she touched her brakes.  The fence, which surrounding the parking lot, buckled but did not give way.

3.29   The suspect car's brake lights then activated for approximately one (1) second, followed by the reverse lights engaging. Kimpel, standing behind the suspect car in front of the next row of cars over, moved to his right towards the Patrol Vehicle.

3.30   As Kimpel crossed in front of Officer Hopkins, Kimpel alerted Hopkins that he was going to cross his line of fire, stating: "watch out, watch out, watch out, watch out." Officer Hess said to the officers behind him "back up, back up" as the two Officers standing directly behind Hess moved backwards away from the moving, threatening, forceful, dangerous, and noncompliant suspect car and its Occupants.

3.31   Hopkins slowly moved away from his previous location to his right, in a northwest direction down the parking lot. No officer was facing towards Hopkins as he moved to his right; they all had their firearms and flashlights focused on the moving, threatening, forceful, dangerous, and noncompliant suspect car and its Occupants.

3.32   Officer Hess stood next to the open door on the Patrol Vehicle.  As the suspect car reversed and passed in front of Hess and the Patrol Vehicle (from right to left), Hess yelled: "**DON'T MOVE!**"  Approximately three minutes and five seconds (3:05) had elapsed since Dallas Police first made contact with the suspect car, without any response or compliance from the Occupants.  Approximately two minutes and four seconds (2:04) had elapsed since Hess had sounded the

emergency siren within feet of the suspect car, without any response or compliance from the Occupants.

3.33    Fearing for his safety and other Officers' safety, Hess fired approximately nine shots into the moving, threatening, forceful, dangerous, and noncompliant suspect car. The suspect car had been reversing directly towards the area in which Kimpel and Hopkins had been immediately standing approximately eight (8) seconds earlier.  Kimpel and Hopkins were still retreating to their right from the reversing suspect car when Hess started firing.

3.34    After Hess fired approximately five shots, Senior Corporal Kimpel fired a single shot into the front passenger door of the suspect car.  Ballistics analysis would later show that Kimpel's single bullet lodged in the front passenger side door.  Kimpel had stopped firing because Hess was in front of him (in his line of fire).  Hess's shots travelled through the front passenger window, some shots struck the driver-side Occupant/Dawes.  Kimpel's single shot did not strike either Occupant.

3.35    After the nine shots from Hess and the single shot from Kimpel, driver-side Occupant/Dawes again accelerated backwards in a noncompliant, threatening, forceful, dangerous manner.  Hess fired three (3) more times into the suspect car, and the suspect car stopped.  Hopkins moved to a position with cover from the suspect car to his left.  Hopkins yelled: "**HANDS UP**!"

3.36    Hess loudly calls on his radio: "Shots fired, Shots fired! Forty-seven hundred east side back parking lot!" Hess replies to the radio operator: "start me an ambulance!"  An Officer yells again: "SHOW US YOUR HANDS!" Hess: "LET ME SEE YOUR HANDS! HANDS UP!" The passenger-side Occupant/Rosales finally complied and showed his hands from the front passenger seat. Another Officer: "HANDS UP!" Hess: "OPEN THE DOOR FROM THE OUTSIDE! REACH OUT, OPEN THE DOOR!"  Hess to dispatch: "Alpha 114, they rammed the squad car twice." Kimpel to Hopkins: "Hey Zach watch yourself man – here, hey fall back, fall back, fall back, fall back." Hopkins was standing in front of Kimpel's, using another car for cover. Hopkins moved to the suspect car behind him and stood next to Kimpel. At this time, Hess, Alisch, Evans and Lickwar were all standing behind the Patrol Vehicle with their weapons drawn on the now stationary suspect car. Kimpel and Hopkins were standing to the left of the Patrol Vehicle, using a parked truck as cover.

3.37    Hess to passenger-side Occupant/Rosales: "OPEN THE DOOR FROM THE OUTSIDE! OPEN THE DOOR FROM THE OUTSIDE!"  Rosales can be seen in the passenger seat reaching out the now shattered passenger window to open the door. An Officer orders Rosales: "OPEN THE DOOR FROM THE OUTSIDE!" Hess addresses the other Officers behind him and to his left: "You guys okay? Everybody alright?" The Officers all responded in the affirmative.

3.38   Hess commands Rosales: "WALK ON YOUR KNEES, TOWARDS ME!"  Rosales was outside the suspect car on his knees, with his hands raised in the air.  He had a jacket on and a blanket wrapped around his legs.  Rosales told Hess that his wife was the only other person in the suspect car.  Now following the Officers' instructions, Rosales walked on his knees towards Hess as Hess slowly approached the suspect car and passenger.  The other Officers continued to hold Rosales and the Journey under their cover.

3.39   As Rosales put his hands on his head, pursuant to the Officers' instruction, Hess slowly walked toward the Journey, gun still drawn. Evans and another Officer approached behind him. As the Officers moved toward the suspect car, Kimpel moved behind the Patrol Vehicle.  Evans moved towards the front of the suspect car.

3.40   Lickwar covered Rosales (who had not yet been searched incident to his detention). Lickwar covered Rosales as he rested on his knees outside the Suspect car.  Hess cleared the suspect car and instructed Evans and Hopkins to keep a gun on Dawes until the ambulance arrived.

3.41   As Lickwar handcuffed Rosales, Hess asked Evans if she sees a weapon – she did not see a weapon at that point. Hess told Dawes that an ambulance was on its way. Kimpel meanwhile moved a Patrol Vehicle that blocked the east entrance.

3.42   Officer Hess then found a holster in the front passenger seat of the suspect car, and alerted the other Officers to be on the lookout for a weapon.  As Hess asked Rosales about any weapons in the suspect car, Hopkins tended to Dawes. After inspection, Hopkins indicated that he was not going to perform CPR because the compressions could pump the blood to the wounds in Dawes's neck. Hopkins put the suspect car in park.

3.43   Hess then asked the group which of them were behind the suspect car when it started reversing in that direction. Kimpel told Hess that he and Hopkins were behind the suspect car, but they had moved.  Hopkins indicated he was not going to move Dawes (currently in critical condition), because she was still breathing.

3.44   An Officer performed a pat-down on Rosales as Hess and Kimpel let dispatch know that Dawes needed medical attention immediately.   After a response from dispatch, Hess and Evans told Dawes that the ambulance was on its way.

3.45   Evans looked in the passenger seat for a weapon – she asked if anyone knew if they had recovered a weapon yet.  The Officers indicated they had not seen a weapon yet. Evans pulled away a pillow from the front passenger seat, and pulled a firearm from behind the center console.  She alerted the other Officers that she had found the firearm.

3.46   The firearm was a tan-colored SCCY, CPX-1, 9mm, semi-automatic handgun. It was loaded but did not have a bullet in the chamber. She later indicated that the gun had blood on it when she placed it in an evidence bag held by Lickwar.   Evans said that the firearm was found with its handle pointed upwards, as if one of the two occupants of the suspect car had placed it upside down.

3.47   Other Officers arriving later, on the scene, escorted Kimpel and Hess into separate Patrol Vehicles and away from the scene.   Eventually, all Officers would be separated. Dawes was transported to the Hospital, where she later died as a result of her wounds.

3.48   The suspect car was filled with random personal items, including: a box for a 40" television, a small tv, a computer modem and a box for a laptop computer.

3.49   The report from Dawes' autopsy indicated there controlled/illegal drugs found in her system, including amphetamine, methamphetamine, diphenhydramine, morphine, codeine, and 6-monoacetylmorphine.   Rosales was treated for his abrasions prior to being transported to the Dallas Police Department.

3.50   The tan handgun recovered from the suspect car was stolen out of Duncanville. Rosales was held pursuant to a charge for the unlawful possession of a firearm.

D.   **P**LAINTIFFS' **C**OMPLAINT IS **N**OT **S**UFFICIENT

111.   As pointed out, Plaintiffs' *Second Amended Complaint* does not provide facts with adequate specificity that, if true, would penetrate Senior Corporal Kimpel's Immunity or overcome a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6).   At best, they are a collection of conclusory allegations that incude Senior Corporal Kimpel.   The *Complaints* ignore facts that must be addressed in the context of all of Plaintiffs' claims and an analysis of the Qualified Immunity Defense.   In accordance with the Fifth Circuit Court's well-settled *Schultea/Backe* procedure, and in accordance with the procedure recommended by the United States Supreme Court, Plaintiffs should be required to file a Reply to the specific immunity assertions.   *See generally Crawford-El*, 523 U.S. at 597–98.

Respectfully submitted,

**MCKAMIE KRUEGER, L.L.P.**


_____*s/ William W. Krueger*_____
**WILLIAM W. KRUEGER, III**
State Bar No. 11740530
bill@mckamiekrueger.com
**CHARLES HILL**
State Bar No. 24063885
Chuck@mckamiekrueger.com
**CHRISTOPHER M. LOWRY**
State Bar No. 24093626
CLowry@mckamiekrueger.com
500 W. Lookout Dr.
Richardson, Texas 75080
214-253-2600 – Telephone
214-253-2626—Facsimile
**ATTORNEYS FOR DEFENDANT
SENIOR CORPORAL KIMPEL**


## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2017, the foregoing pleading was filed with the clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.


_____*s/ William W. Krueger*_____
**WILLIAM W. KRUEGER, III**