UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| MARY DAWES, *individually and as the Administrator of the Estate of Decedent Genevive A. Dawes*; ALFREDO SAUCEDO; and VIRGILIO ROSALES, | § § § § § § § | Civil Action No. 3:17-CV-1424-X |
| *Plaintiffs*, | § § | |
| v. | § § | |
| CITY OF DALLAS, CHRISTOPHER HESS, and JASON KIMPEL, | | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER

This case is about the 2017 shooting of Genevive Dawes by Dallas Police Department officers. Before the Court is the United States Magistrate Judge's findings, conclusions, and recommendation [Doc. No. 136] on defendant-Officer Christopher Hess's and defendant-Officer Jason Kimpel's motion for summary judgment asserting qualified immunity [Doc. No. 104]. For the reasons explained below, the Court **ACCEPTS IN PART** and **REJECTS IN PART** the Magistrate Judge's report and **GRANTS** the defendants' motion for summary judgment.

## I.      Background

Around 5:00 am on January 18, 2017, Genevive Dawes and Virgilio Rosales were sitting in the front seats of a black Dodge Journey SUV that Dawes had parked

in the back corner of an apartment complex's parking lot.[1]  To the right side of Dawes's car was another vehicle.[2]  There was a white trellis fence to the left and in front of Dawes's car.[3]  Behind Dawes's car was a lane for accessing the parking spots and on the other side of that was a row of parked cars.[4]

Defendants Christopher Hess and Jason Kimpel and four other Dallas Police Department officers were dispatched to the location to investigate a report of a suspicious vehicle in the corner of the lot with a man and woman inside.[5]  At some point during the incident, the officers learned that Dawes's car had been reported stolen.[6]  Shortly after the officers arrived, they began shining their flashlights into the car's windows and yelling commands such as "put your hands out the window."[7] The area was dark and poorly lit, and Dawes's car windows were tinted and steamed up, making it difficult to see inside.[8]

Dawes's car was not moving.  An officer remarked that the officers had been informed that there "was a male and female inside."[9]  Officer Hess retrieved the closest squad car and pulled it up diagonally, facing the right rear side of Dawes's

---

[1] Doc. No. 106-1 at 4; Doc. No. 126 at 6–7.

[2] Doc. No. 106-1 at 4; Doc. No. 126 at 7.

[3] Doc. No. 106-1 at 4; Doc. No. 126 at 7; Evans Bodycam at 3:56.

[4] Evans Bodycam at 0:53–1:05.

[5] Doc. No. 106-1 at 4.

[6] Doc. No. 106-1 at 4; Doc. No. 106-1 at 9; Doc. No. 126 at 40.

[7] Evans Bodycam at 1:00–1:03, 1:32–2:00.

[8] Doc. No. 106-1 at 9; *see also* Doc. No. 126 at 7.

[9] Evans Bodycam at 1:48–52; Doc. No. 126 at 38; Kimpel Bodycam at 1:20–1:25.

vehicle.[10]  Then, Officer Hess sounded the squad car's air horn, activated a short siren yelp, and turned on the car's spotlight, but did not turn on flashing emergency lights.[11]  Officer Hess exited the squad car and walked to be near the rear left corner of Dawes's car, and stood beside two other officers for approximately 20 seconds.[12]

As officers stood nearby, Officer Hopkins slowly approached Dawes's car and pulled on the right rear door handle and the trunk handle, which appeared to be locked, and an officer announced that two people were asleep inside the car.[13]  Officer Hess heard the statement.[14]  A few seconds later, two officers yelled at Dawes and Rosales to show their hands.[15]  After a short time, officers twice ordered them, again, to show their hands while another officer yelled, "Dallas police."[16]  Another officer stated that someone was moving around inside the vehicle.[17]  Officers again twice ordered Dawes and Rosales to show their hands, but they did not do so, although at least one of them started moving around inside the car.[18]

---

[10] Doc. No. 106-1 at 4.

[11] Evans Bodycam at 1:58–2:11; Doc. No. 104-1 at 4.

[12] Hess Bodycam 0:14–0:35; Kimpel Bodycam at 1:32–1:58; Evans Bodycam at 2:00–2:04; Lickwar Bodycam at 2:00; Hopkins Bodycam at 4:17; Doc. No. 106-1 at 4; Doc. No. 126 at 119.

[13] Hopkins Bodycam at 4:41–5:00; Doc. No. 126 at 40–41; Doc. No. 126 at 68; Kimpel Bodycam at 2:00–2:10; Evans Bodycam at 2:30–2:38; Doc. No. 126 at 119.

[14] Doc. No. 126 at 40–41.

[15] Kimpel Bodycam at 2:10–2:12.

[16] Kimpel Bodycam at 2:26–2:42.

[17] Kimpel Bodycam at 2:40–2:42.

[18] Kimpel Bodycam at 2:45–2:57.

Less than thirty seconds later, Dawes started her car, at which point the officers again screamed commands for Dawes and Rosales to show their hands.[19] When Officer Hess observed Dawes's car turn on, he got back in the squad car, telling the other officers to "watch out" and "move move move," as he moved the squad car closer.[20] As Officer Hess moved the squad car, Dawes's car began moving backwards. Right after Officer Hess stopped, Dawes's car hit the squad car.[21] Dawes then changed directions, drove forward, and hit the fence in front of her car.[22] Then Dawes put the car back in reverse. At the moment that Dawes's reverse lights came on for the second time and 6.1 seconds before Officer Hess fired the first shot, the officers were in the following locations:[23]

---

[19] Kimpel Bodycam at 3:11–3:14.

[20] Doc. No. 106-1 at 4; Hess Bodycam at 0:51-59; Kimpel Bodycam at 3:20; Evans Bodycam at 3:40.

[21] Doc. No. 106-1 at 4; Kimpel Bodycam at 3:10–3:20; Evans Bodycam at 3:40; Doc. 126 at 8 (Rosales Decl.); Hess Bodycam at 1:00–1:02; Hopkins Bodycam at 6:04; Kimpel Bodycam at 3:19.

[22] Doc. No. 126 at 8 (Rosales Decl.); Hopkins Bodycam at 6:07–6:10; Kimpel Bodycam at 3:24–3:28.

[23] While screenshots are helpful and the Court therefore includes them in its written Order, the Court ultimately bases its findings on the video footage as a whole. Screenshots help the reader see the "facts evident from the video recordings"—and will have to suffice until technology advances enough to support paper that plays video. *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).



"Watch out, watch out, watch out, watch out," Officer Kimpel said, as he and Officer Hopkins walked behind Dawes's vehicle toward the rear left side of the squad car.[25]  As they walked, Officer Hopkins was behind Officer Kimpel.[26]  Dawes's car began moving backwards.[27]  The officers continued to yell commands.[28]  By this point, Officer Hess had exited the squad car and stood behind the driver's door, with his weapon drawn and trained on Dawes's car.[29]  Officer Hess told the other officers, "back up back up," and ordered Dawes and Rosales not to move.[30]

---

[24] Video "2-C Sync_With_Camera_Views" at 0:22.

[25] Kimpel Bodycam at 3:25–3:37; Hopkins Bodycam at 6:10–6:18.

[26] Hopkins Bodycam at 6:10–6:15.

[27] Hess Bodycam 1:08–1:13.

[28] *Id.*

[29] Hess Bodycam at 1:07.

[30] Kimpel Bodycam at 3:25–3:37; Hess Bodycam 1:08–1:14.

Dawes's car continued to move in reverse at a low rate of speed.[31]  One-tenth of a second before Officer Hess fired the first shot, the officers' positions and the speed of Dawes's car was thus:



Then, in a span of about four seconds, Officer Hess fired nine rounds at the passenger side of Dawes's vehicle, shattering the passenger window.[33]  At some point during Officer Hess's firing his first nine rounds, Officer Kimpel fired his one and only round.[34]

---

[31] Hess Bodycam at 1:10–1:16.

[32] Video "2-D Velocity_Positions_Time_to_Shots" at 0:38.

[33] Doc. No. 106-1 at 5 (Hess Affid.); Doc. No. 126 at 44 (Hess Depo.); *see also* Hess Bodycam at 1:15–1:20; Kimpel Bodycam at 3:35–3:38; Hopkins Bodycam at 6:19–6:23; Evans Bodycam at 4:03–4:07.

[34] Doc. No. 126 at 120 (IA Brief).

Dawes's car momentarily stopped.[35]  From when Dawes's car began moving backwards after hitting the fence in front of her car to when her car momentarily stopped after the initial shots were fired, Dawes's car's maximum speed was 3.2 miles-per-hour.[36]

When Dawes's car momentarily stopped, Officer Hess could then see inside the vehicle and observed that Dawes appeared to have been shot at least once.[37]  Her hands were no longer on the steering wheel, as she had one hand on her chest and one in her lap.

But then Dawes's car started moving again, and Officer Hess fired three more shots before Dawes's car came to rest.[38]  Officer Hess then approached Dawes's car where she was slumped in the reclined driver's seat with her left hand in her lap and her right hand next to her head.[39]

Several minutes later Officer Hess asked Officer Kimpel "who was back there," and Officer Kimpel responded, "me and Hopkins, we moved."[40]  Bodycam footage shows that both Officers Hopkins and Kimpel had moved out of Dawes's immediate, direct path as she moved backwards after hitting the fence—with Officer Kimpel

---

[35] Hess Bodycam 1:13–1:17; Doc. No. 106-1 at 5 (Hess Affid.); Doc. No. 126 at 8 (Rosales Decl.).

[36] Video "2-D Velocity_Positions_Time_to_Shots" at 0:30–0:40.

[37] Doc. No. 126 at 45 (Hess Depo.).

[38] Hess Bodycam at 1:17–1:20.  Because Dawes's car started moving again, this is not like cases where an officer shoots a "clearly incapacitated suspect" and thus violates the suspect's clearly established, constitutional rights.  *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015).

[39] Hess Bodycam at 3:20–3:47.

[40] Hess Bodycam at 4:48–4:53; Doc. No. 126 at 48 (Kimpel Depo.).

moving in front of and/or to the right of Officer Hopkins.[41]   At the moment that Officer Hess fired the first shot, no officer was directly behind Dawes's car—they were all located on the passenger side at varying distances and some officers had the patrol car positioned between Dawes's car and themselves:



After the passenger window had been shot out, Rosales eventually exited Dawes's car at the officers' directions and was handcuffed until an ambulance arrived to assist Dawes, who later died at the hospital.[43]   Officers searched Dawes's car and discovered a small handgun underneath a pillow between the driver and passenger seat behind the central console.[44]   The defendants were not aware of the gun at the

---

[41] Kimpel Bodycam at 3:25–3:37; Hopkins Bodycam at 6:14–6:18; Hess Bodycam at 1:17–1:22; Doc. 126 at 73 (Kimpel Depo.).

[42] Video "2-C Sync_With_Camera_Views" at 0:28.

[43] Doc. No. 126 at 8 (Rosales Decl.).

[44] Doc. No. 106-1 at 11 (Evans Affid.); Doc. No. 126 at 9 (Rosales Decl.).

time of the shooting.[45]  An investigation subsequently revealed that Officer Kimpel's bullet struck Dawes's car and four of Officer Hess's bullets struck Dawes.[46]

In her report and recommendation, the Magistrate Judge helpfully recounted some of the parties' subsequent testimony about that fateful night.[47]  Here are some highlights: Rosales testified that Dawes awakened him and told him that she heard something outside the car.[48]  He could hear voices and yelling, but says that the fogged-up windows and bright lights outside the car made it difficult to discern what was happening.[49]

Officer Hess testified that he pulled the squad car forward to provide cover for the officers and to limit the space available for Dawes to accelerate if she tried to run down the officers.[50]  Officer Hess testified that he interpreted Dawes hitting the fence in front of her car as a failed attempt to escape.[51]  He testified that he fired at Dawes because he believed that Officers Hopkins and Kimpel were in her path and that Dawes was trying to run over them.[52]  Similarly, Officer Kimpel testified that he shot because he thought that Officer Hopkins was in Dawes's path and that Dawes's

---

[45] Doc. No. 126 at 43–44 (Hess Depo.); Doc. No. 126 at 74 (Kimpel Depo.).

[46] Doc. No. 126 at 120 (IA Brief).

[47] Doc. No. 136 at 13–15.

[48] Doc. No. 126 at 7.

[49] *Id.*

[50] Doc. No. 106-1 at 4.

[51] *Id.* at 5.

[52] *Id.* at 4–5.

vehicle posed a danger.[53]  As it turned out, all officers were out of Dawes's direct, immediate path when Hess and Kimpel fired their rounds.

The plaintiffs filed this suit against the City of Dallas and Officers Kimpel and Hess under 42 U.S.C. § 1983.[54]  The plaintiffs assert that Officers Hess and Kimpel violated Dawes's and Rosales's Fourth Amendment right to be free from excessive force.

Officers Hess and Kimpel filed a motion for summary judgment on the basis of qualified immunity.[55]  The Magistrate Judge entered her findings, conclusions, and recommendations on the motion.[56]  The Magistrate Judge found that there were at least four genuine disputes of material fact precluding summary judgment and recommended denying qualified immunity to both Officers Hess and Kimpel.

## II.        Summary Judgment Standard

Courts must grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[57]  A material fact is one "that might affect the outcome of the suit under the governing law."[58]  And a "dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[59]  Courts "resolve

---

[53] Doc. No. 126 at 65–67.

[54] Doc. No. 91.  This motion for summary judgment does not involve the City of Dallas.

[55] Doc. No. 104.

[56] Doc. No. 136.

[57] FED. R. CIV. P. 56(a).

[58] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[59] *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[60]  "Summary judgment is not foreclosed by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[61]

Before reaching the substantive qualified-immunity analysis, the Court addresses the four purported genuine disputes of material fact that the Magistrate Judge identified in her report and recommendation.  The Magistrate Judge concluded that "many facts are disputed . . . which would significantly impact the analysis" such as (1) "whether Plaintiffs knew police officers were outside the vehicle," (2) "whether Dawes's car hit Hess's car or vice-versa," (3) "whether Dawes reversed out of the parking lot quickly or slowly," and (4) "where officers were located at various times during the interaction."[62]

In their objections to the Magistrate Judge's report, the defendants assert that none of these facts are in dispute.[63]  The defendants stress that "[t]he speed of Dawes's car and the locations of the officers . . . are not in dispute."[64]  In response to the defendants' objections, the plaintiffs do not argue that there are genuine disputes of material fact.  Rather, they argue that the undisputed, objective speeds and

---

[60] *Lexon Ins. Co. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021) (cleaned up).

[61] *Id.* at 322 (cleaned up).

[62] Doc. No. 136 at 21–22.

[63] Doc. No. 137 at 6.

[64] Doc. No. 137 at 2.

locations are more important for the qualified-immunity analysis than the officers' subjective perspectives.[65]  Thus, it appears that the parties agree that there are no genuine disputes of material fact.  Nevertheless, the Court will examine each of the Magistrate Judge's findings.

As for purported dispute (1) (whether the plaintiffs knew that police officers were outside the vehicle), even assuming that it is disputed, it is not material.  The Magistrate Judge correctly acknowledges elsewhere in her report that the qualified-immunity inquiry focuses on the objective reasonableness of the officer-defendants' actions, not the subjective knowledge of the plaintiffs.

As for purported dispute (2) (whether Dawes's car hit Officer Hess's car or vice-versa), this fact is not actually disputed.  The plaintiffs stated in their response to the defendants' motion for summary judgment: "As [Dawes] backed out of the parking spot, she bumped into something. . . . She had bumped into the squad car . . . ."[66]  The defendants do not dispute the plaintiffs' characterization and, importantly, the plaintiffs do not say that this fact is disputed in their response to the defendants' objections to the Magistrate Judge's report.  Plus, Officer Hopkins's bodycam shows that the squad car was not moving when Dawes's car hit the squad car.[67]

As for purported disputes (3) and (4) (whether Dawes reversed out of the parking lot quickly or slowly and where officers were located at various times during

---

[65] *See* Doc. No. 138 at 8.

[66] Doc. No. 125 at 13.

[67] Hopkins Bodycam at 6:01–6:06.

12

the interaction), the defendants and the plaintiffs agree as to the speed of Dawes's car at all times and the locations of all officers at all times. The record and briefs contain video recreations of the incident that track both the speed of Dawes's car and the officers' locations, and no party disputes their accuracy.[68]

Accordingly, the Court determines that none of these four topics amounts to a genuine dispute of material fact that would preclude summary judgment.

### III.        Qualified Immunity

Title 42 U.S.C. § 1983 authorizes plaintiffs to bring claims "against persons in their individual or official capacity, or against a governmental entity."[69] A party has a colorable claim under section 1983 if the plaintiff can "allege a violation of a right secured by the Constitution or laws of the United States and demonstrate that the alleged deprivation was committed by a person acting under color of state law."[70]

The doctrine of qualified immunity provides a defense against these claims to government officials who "make reasonable but mistaken judgments about open legal questions" and shields "all but the plainly incompetent or those who knowingly violate the law."[71] Qualified immunity presents two questions. "The first question is whether the officer violated a constitutional right. The second question is whether

---

[68] *See, e.g.*, Doc. No. 125 at 13. The defendants *do* object that the videos are irrelevant, but not that they are inaccurate. Doc. No. 131 at 6.

[69] *Pratt v. Harris Cnty.*, 822 F.3d 174, 180 (5th Cir. 2016) (cleaned up).

[70] *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (cleaned up).

[71] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

13

the right at issue was clearly established at the time of the alleged misconduct."[72]  A court can begin its inquiry with either prong.[73]

Once a defendant has made a good-faith assertion of the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.[74] So the plaintiff has to deal with both prongs: (1) "the plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury"; and (2) "the plaintiff's version of those disputed facts must also constitute a violation of clearly established law."[75]

### A.    Clearly Established Law[76]

Qualified immunity's second prong "requires the plaintiff to 'identify a case'— usually, a 'body of relevant case law'—in which 'an officer acting under similar

---

[72] *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021) (cleaned up).

[73] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[74] *Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020).

[75] *Id.* at 330.

[76] A brief preliminary note: The plaintiffs argue that the Court is bound by its determination at the motion-to-dismiss stage that *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), provided the clearly established law for Officers Hess and Kimpel to know that their conduct was unconstitutional. *See* Doc. No. 125 at 33 (Plaintiffs' Response to Defendants' Motion for Summary Judgment); Doc. No. 87 at 9–10 (Court's order on motion to dismiss finding that *Lytle* provided clearly established law in light of plaintiffs' allegations that no one was behind Dawes's car when he backed up and the officers did not have to react to an "abrupt change of direction").  When the Court made that finding at the motion-to-dismiss stage, it had not considered the video and bodycam footage of the incident.  The Court did not have the parties' discovery to aid it in the qualified-immunity analysis.  The Court did not have the benefit of the Fifth Circuit's recent guidance that it is "dubious" that *Lytle* stands for the proposition that "an officer lacks an objectively reasonable basis for believing his own safety is at risk— and therefore cannot use concerns about his own safety to justify deadly force—when he is not in the path of the vehicle."  *Harmon v. City of Arlington*, 16 F.4th 1159, 1166–67 (5th Cir. 2021).  The Court considered only the limited context and allegations that the plaintiffs' complaint provided and accepted them as true.  Summary judgment is very different, and the Court is not bound by its prior determination based only on the plaintiffs' allegations.  Rather, at summary judgment, the Court will analyze all the evidence—without weighing evidence, evaluating the credibility of witnesses, or resolving factual disputes—and determine whether a reasonable jury drawing all inferences in favor

---

circumstances . . . was held to have violated the [Constitution].'"[77]  "A right is 'clearly established' only if preexisting precedent 'ha[s] placed the . . . constitutional question beyond debate.'"[78]  The burden is "heavy."[79]  "[A]s the Supreme Court has repeatedly admonished lower courts, we must define [the] constitutional question with specificity."[80]  "[T]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"[81]

"The specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force."[82]  "[O]vercoming qualified immunity is especially difficult in excessive-force cases."[83]  "[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."[84]  "To overcome qualified immunity, the law must be so clearly established that *every* reasonable officer in this factual context . . . would have known he could not use deadly force."[85]  And it is "the *plaintiff's* burden to find a case in his favor that does not define the law at a high level of generality."[86]

---

of the nonmoving party could arrive at a verdict in that party's favor.  *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021).

[77] *Joseph*, 981 F.3d at 330 (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

[78] *Harmon*, 16 F.4th at 1165 (quoting *Ashcroft*, 563 U.S. at 741).

[79] *Id.*

[80] *Id.* at 1166.

[81] *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

[82] *Id.*

[83] *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019).

[84] *Harmon*, 16 F.4th at 1166 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

[85] *Id.*

[86] *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (emphasis added) (cleaned up).

15

Here, the Court chooses to begin with the second prong and asks: Could officers Hess and Kimpel have reasonably interpreted the law in existence as of January 18, 2017 to conclude that the perceived threat that Dawes posed was sufficient to justify deadly force?[87]

The clearly established prong requires the Court to place this case's specific facts against the backdrop of other cases where a court found that the defendant violated the Constitution.[88]  The north star of excessive-force cases is the Supreme Court's decision in *Tennessee v. Garner*.[89]  *Garner* is substantially different from this case because *Garner* involved a suspect fleeing on foot,[90] but *Garner* did establish a "framework" that "forbids deadly force unless the officer had probable cause to believe [a] suspect poses 'a threat of serious physical harm' to the officer or others."[91]  In placing this case on the factual spectrum of others cases, the Court keeps the *Garner* framework in mind and also heeds the Supreme Court and Fifth Circuit's repeated, clear instructions to define clearly established law with specificity—so much specificity that the officer's conduct must have been "clearly unreasonable . . . in the specific situation the officer confronted."[92]

---

[87] *See Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010).

[88] Doc. No. 136 at 25; *Joseph*, 981 F.3d at 330.

[89] *Tennessee v. Garner*, 471 U.S. 1 (1985).

[90] *Id.* at 3–4.  Importantly, the "the Supreme Court has warned . . . against extending *Garner*." *Morrow*, 917 F.3d at 878.

[91] *Goldston v. Anderson*, 775 F. App'x 772, 773 (5th Cir. 2019) (quoting *Garner*, 471 U.S. at 3).

[92] *Goldston*, 775 F. App'x at 773; *see also Harmon*, 16 F.4th at 1166.

In her report and recommendation, the Magistrate Judge first examined *Hathaway v. Bazany*.[93]   There, "a police officer who was on foot fired at a vehicle immediately after it struck him."[94]   The Fifth Circuit affirmed the district court's *grant* of qualified immunity to the officer.   The Fifth Circuit "determined that the vehicle, which had accelerated toward the officer after he had attempted to pull it over, posed such a threat to the officer that the use of deadly force was objectively reasonable even if the officer had fired immediately after the vehicle struck him."[95] The Fifth Circuit "reasoned that the extremely brief period of time between when the car accelerated toward and struck the officer and the officer's firing of his weapon was insufficient for the officer to perceive new information indicating the threat was past."[96]

The Magistrate Judge also analyzed *Poole v. City of Shreveport*, a 2021 Fifth Circuit opinion arising from a March 31, 2017[97] incident in which a police officer shot a suicidal man after he exited his vehicle following a low-speed car chase.[98]   The district court found genuine disputes of material fact as to whether the officer warned the suspect before the shooting, whether the suspect was turned away from the officer, and whether it was apparent that the suspect's hands were empty, and thus

---

[93] *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007).

[94] *Lytle*, 560 F.3d at 413 (describing *Hathaway*).

[95] *Id.*

[96] *Id.* at 413–14 (internal quotations omitted).

[97] This case's incident occurred on January 18, 2017.

[98] *Poole v. City of Shreveport*, 13 F.4th 420, 422 (5th Cir. 2021).

denied summary judgment.[99]  The Fifth Circuit affirmed the denial of summary judgment and qualified immunity, agreeing with the district court that there were genuine disputes of material fact.[100]  The Fifth Circuit noted that summary judgment was inappropriate in light of the disputed facts because—if a reasonable jury accepted the plaintiff's version of the facts—then it could reasonably conclude that the officer violated the plaintiff's rights.[101]

There are two reasons that *Poole* does not provide the clearly established law that the plaintiffs here need to overcome Officer Hess's and Officer Kimpel's assertion of qualified immunity.  First, *Poole* presented significantly different facts from this case, the Fifth Circuit based its affirmance on the genuine disputes of material fact, and the underlying incident occurred after the incident in this case.  So, for multiple reasons, *Poole* itself cannot provide the clearly established law for this case.  Second, the *Poole* panel cited several cases demonstrating in specific circumstances the clearly established law that deadly force is excessive unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.[102]  But all of those cases present significantly different facts, and the Court cannot extrapolate from those very different cases a clearly established law

---

[99] *Id.* at 423–24.

[100] *Id.*

[101] *Id.* at 426 ("If a jury views the disputed facts in favor of the plaintiff—concluding that Briceno shot Poole, without warning, seeing that he was empty-handed and turning away from the officer—then Briceno violated Poole's clearly established right to be free from unreasonable seizure.").

[102] *Id.* at 425 (citing *Garner*, 471 U.S. at 11; *Roque v. Harvel*, 993 F.3d 325, 329 (5th Cir. 2021); *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019); *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018); *Lytle*, 560 F.3d at 417).

for this case—without contravening the Supreme Court and Fifth Circuit's repeated and clear warnings that qualified-immunity's second prong is a high bar and must be defined with specificity.

The Magistrate Judge analyzed another Fifth Circuit case, *Goldston v. Anderson*, a 2019 opinion arising from a 2015 incident.[103]  In *Goldston*, a police officer named Straten was surveilling the suspect, Goldston, at Goldston's girlfriend's house.[104]  Goldston had several outstanding arrest warrants on him, one of which alleged that Goldston had attempted to run over and drag a police officer.[105]  The Fifth Circuit recounted the facts:

> When Goldston arrived at the house, Straten notified Officer Anderson, who was waiting nearby to help if necessary.  When Goldston began to back out of the driveway in his pickup truck, Anderson blocked the vehicle with his patrol car.  Goldston got out of his truck and Anderson ordered him to show his hands and get on the ground.  Instead, Goldston got back into the truck and locked the doors.  Straten positioned her unmarked minivan behind him at an angle, boxing him in.  Apparently trying to escape, Goldston began to back up quickly toward Straten and Anderson fired into the cab, striking Goldston multiple times.[106]

The Fifth Circuit affirmed the district court's grant of qualified immunity to Officer Anderson.  On the clearly established law prong, the Fifth Circuit rejected Goldston's argument that *Garner*'s "general standard" provided the clearly established law forbidding the specific actions that Officer Anderson took.[107]  Instead,

---

[103] *Goldston v. Anderson*, 775 F. App'x 772 (5th Cir. 2019).

[104] *Id.*

[105] *Id.*

[106] *Id.* at 772–73.

[107] *Id.* at 773.

"[e]xisting precedent must place the conclusion that Anderson acted unreasonably in these circumstances beyond debate."[108]  The Fifth Circuit found that Goldston had not met this "high bar."[109]

Like *Poole*, *Goldston* does not provide the clearly established law that the plaintiffs need.  The officers in *Goldston* were *granted* qualified immunity because the plaintiff lost on both of qualified immunity's prongs.  For the same reason, *Hathaway* didn't clearly establish the law putting Officers Hess and Kimpel on notice that their actions were unconstitutional.

For their part, the plaintiffs argue that "*Garner* provides clearly established law" "under these circumstances."[110]  But the Fifth Circuit says no: "At most, *Garner* prohibits using deadly force against an unarmed burglary suspect fleeing on foot who poses no immediate threat."[111]  *Garner* provides only the "general standard" for deadly force cases, and plaintiffs must go beyond *Garner* and identify a case with specificity.[112]

The plaintiffs also cite *Lytle*, where the Fifth Circuit viewed the facts in the light most favorable to the plaintiff and explained that—if the police officer in that case had indeed shot the suspect when the suspect was in a fleeing vehicle three-to-four-houses' distance away from the officer—then the officer violated the suspect's

---

[108] *Id.* (cleaned up).

[109] *Id.*

[110] Doc. No. 125 at 35.

[111] *Harmon*, 16 F.4th at 1167.

[112] *Goldston*, 775 F. App'x at 773.

constitutional rights.[113]   The facts in *Lytle* are significantly different from the facts of this case.   Whereas, in *Lytle*, the Fifth Circuit assumed for summary-judgment purposes that the suspect was far away, here the suspects' vehicle was relatively close to the officers in a confined space in the corner of a parking lot.[114]

The plaintiffs also quote *Newman v. Guedry*, where the Fifth Circuit held that the plaintiff's "right to be free from excessive force . . . was clearly established in August 2007."[115]   That was true for the *Newman* plaintiff, but unfortunately for the plaintiffs here, that does not translate to clearly established law for this case because the facts are extremely different.   The *Newman* plaintiff and officer essentially engaged in hand-to-hand combat after the suspect got out of his car during a traffic stop and consented to a pat-down search.[116]   Nothing like that occurred here.

*Irwin v. Santiago*[117] is another relevant Fifth Circuit qualified-immunity case which arose from a June 8, 2018 incident.[118]   In *Irwin*, one officer was standing toward the front driver's side of the suspect's vehicle and another was standing toward the back driver's side.[119]   The suspect began to "slowly roll his vehicle forward."[120]   Both

---

[113] *Lytle*, 560 F.3d at 412–13.

[114] Hess Bodycam 1:00–1:20.

[115] 703 F.3d 757, 763 (5th Cir. 2012).

[116] *Id.* at 759–60.

[117] *Irwin v. Santiago*, 2021 WL 4932988, (5th Cir. Oct. 21, 2021).

[118] *See Irwin v. Santiago*, No. 3:19-CV-2926-B, 2021 WL 75452 (N.D. Tex. Jan. 8, 2021) (Boyle, J.).

[119] *Irwin*, 2021 WL 4932988, at *1.

[120] *Id.*

officers fired their weapons.[121]   The Fifth Circuit agreed with the district court's determination that the law was not clearly established on the date of the incident to give the officers notice that their conduct would have violated the Constitution.[122] The Fifth Circuit explained: "[W]e have only been able to find . . . circuit precedent establishing a Fourth Amendment violation where an officer was positioned *behind* a vehicle that was *moving away from him* as he fired."[123]   That didn't cut it, so the Fifth Circuit affirmed the grant of qualified immunity.   For similar reasons and considering the earlier date of the incident here (January 18, 2017), *Irwin* counsels against finding that the law was clearly established to give Officers Hess and Kimpel fair warning that their conduct was unconstitutional.

One exception to the requirement that a plaintiff identify clearly established law is when a case presents facts so grotesque, so egregious, so "obvious" that the defendant cannot claim immunity based on a lack of prior caselaw.[124]   For example, the Supreme Court held in *Hope v. Pelzer* that a defendant would need no prior law to give him fair warning that handcuffing a prisoner to a hitching post for seven hours and depriving him of food and water would violate the Constitution's Eighth Amendment.[125]

---

[121] *Id.*

[122] *Id.* at *3.

[123] *Id.*

[124] *See Reyes*, 362 F. App'x at 408 ("Indeed, unless the violation is 'obvious,' there must be relevant case law that 'squarely governs' the situation . . . ." (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004))).

[125] *Hope v. Pelzer*, 536 U.S. 730, 745 (2002).

The Fifth Circuit recently explained: "No doubt 'obvious' excessive force cases can arise. . . . But they are so rare that the Supreme Court has *never* identified one in the context of excessive force."[126]  Here, the Magistrate Judge did not find this to be an "obvious" case, but the plaintiffs appear to argue that it is,[127] so the Court briefly addresses it.  The facts of this case are a *far* cry from tying a prisoner to a hitching post for seven hours.  They are a far cry from defendant officers leaving prisoners in cells containing "massive amounts of feces over a period of six days."[128] They are a far cry from defendant public officials seeking to criminally prosecute a journalist for asking them questions.[129]  This is not an "obvious-constitutional-violation" case and the Court rejects the plaintiffs' argument.

It is not the defendants' burden to identify clearly established law showing that they *did not* violate the plaintiffs' constitutional rights.  Rather, it is the plaintiffs' burden to provide clearly established law that put the officers on notice that they *did* violate the plaintiffs' constitutional rights—and the plaintiffs' burden is heavy.[130] The plaintiffs have not carried their burden.  The Court must obey the Supreme Court's and Fifth Circuit's recent, unequivocal, forceful instructions to define clearly established law with specificity.  And that requires finding that Officers Hess and Kimpel deserve qualified immunity.

---

[126] *Harmon*, 16 F.4th at 1167.

[127] Doc. No. 125 at 35.

[128] *Villarreal v. City of Laredo*, 17 F.4th 532, 539 (5th Cir. 2021) (describing *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (reversing Fifth Circuit's grant of qualified immunity)).

[129] *Villarreal*, 17 F.4th at 540.

[130] *Vann*, 884 F.3d at 310; *Harmon*, 16 F.4th at 1165.

B. *Constitutional Violation*

Because the Court concludes that the plaintiffs fail on qualified immunity's second prong, it need not address the first prong, which asks whether the defendant officers violated the plaintiffs' constitutional rights to be free from excessive force. Nevertheless, the Court does so.

"To prevail on an excessive force claim, a plaintiff must establish injury which resulted directly and only from a use of force that was clearly excessive and the excessiveness of which was clearly unreasonable."[131]   "[T]he relevant Fourth Amendment questions are whether the force was 'excessive' and 'unreasonable' as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[132]   "That calculus 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"[133]

"In evaluating whether the officer used 'excessive' force, courts consider the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[134]   The Fifth Circuit holds that "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when

---

[131] *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (cleaned up).

[132] *Harmon*, 16 F.4th at 1163 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[133] *Id.* (quoting *Graham*, 490 U.S. at 396–97).

[134] *Id.* (quoting *Graham*, 490 U.S. at 396).

24

the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others."[135]  "A court must 'be cautious about second-guessing [the] police officer's assessment' of the threat level."[136]

Although this case presents a relatively close question of whether a constitutional violation occurred, the Court concludes that, on balance, Officers Hess and Kimpel reasonably believed that Dawes posed a threat of serious harm to themselves and the other officers.

Less than one minute before Officer Hess fired the first shot, he had walked over to and stood by Officers Kimpel and Hopkins, who were standing a few feet from the rear left corner of Dawes's vehicle, with the fence behind and to their left, and the

---

[135] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

[136] *Harmon*, 16 F.4th at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)).

row of parked cars behind and slightly to their right.[137]  The view from Officer Hess's bodycam as he approached Officers Kimpel and Hopkins:



[138]

After standing by Officers Kimpel and Hopkins for a few seconds, Officer Hess stood behind Dawes's car for a few seconds, shining his flashlight in the back window, yelling "Hands up!," and training his gun on Dawes's car.[139]  When Dawes turned her car on, Officer Hess quickly got into the squad car and moved it forward as other officers continued to scream commands at Dawes and Rosales.[140]  After Dawes hit the squad car while Officer Hess was in it, drove forward, and as she hit the fence, Officer

---

[137] Hess Bodycam at 0:07–0:20; *see also* Hess Bodycam at 1:24 (showing row of parked cars that was on the other side of the path that accessed the parking spots, and behind Dawes's car).

[138] Hess Bodycam at 0:15.

[139] Hess Bodycam at 0:27–0:40.

[140] Hess Bodycam at 0:48–1:02.

Hess stepped out of the squad car and trained his gun on Dawes's car.[141]  The view from Officer Hess's bodycam as Dawes's reverse lights came on for the second time:



[142]

---

Officers Kimpel and Hopkins were, at that moment, in the direct path behind

Dawes's car:



[143]

---

The view from Officer Hopkins's bodycam, as Officer Hess stood behind the squad car door with his gun drawn and trained on Dawes's car, and as Officers Hopkins and Kimpel were in Dawes's car's direct path:



As Dawes drove her car backwards and the officers continued to scream commands, and after a few seconds, Officers Hess and Kimpel fired their weapons.

What matters for the constitutional inquiry is whether the officers believed— *on the scene*—that the suspect posed a threat of serious harm and whether that belief was objectively reasonable.[145]   The contemporaneous, on-scene assessment (and its reasonableness or lack thereof) is determinative because we must never "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex

---

[144] Hopkins Bodycam at 6:09.

[145] *See Harmon*, 16 F.4th at 1163.

world that policemen face every day."[146]   Indeed, "[w]hat constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure" or, for example, during a deposition months after the incident, aided by the 20/20 vision of hindsight bestowed on the viewer by bodycam footage.[147]

Here, it is undisputed that both Officer Hess's and Officer Kimpel's on-scene assessment was that Dawes's vehicle posed a threat of serious harm to themselves and other officers.   Officer Hess believed that "two officers [were] behind [Dawes's] vehicle"[148] and Officer Kimpel also "believe[d] there was somebody there"[149] behind Dawes's vehicle.   Thus, the only remaining question is whether that belief was objectively reasonable.

On these facts, the Court concludes that Officers Hess and Kimpel reasonably believed that Dawes posed a threat of serious harm to themselves and other officers. Specifically, Officer Hess reasonably believed that Officers Kimpel and Hopkins were in danger, Officer Kimpel reasonably believed that Officer Hopkins was in danger, and the officers reasonably acted in accord with those reasonable beliefs.

---

[146] *Malbrough v. Stelly*, 814 F. App'x 798, 806 (5th Cir. 2020) (quoting *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994)).

[147] *See Stroik*, 35 F.3d at 158–59 (cleaned up).

[148] Doc. No. 126 at 40; *see also* Doc. No. 106-1 at 5 ("I believed at least two officers were positioned behind the suspects' vehicle . . . . I then witnessed the female suspect place the vehicle in reverse again, and back directly toward the location where I believed two officers remained.").

[149] Doc. No. 126 at 64; *see also id.* at 73 ("When I fired, I believed [Dawes's vehicle] did pose a danger."); Doc. No. 106-1 at 9 ("Officer Hopkins and I backed up to a position behind [Dawes's] vehicle . . . . The suspect then placed the vehicle in reverse and I moved to the right while crossing in front of Officer Hopkins.  The suspect then began backing up toward where I believed Officer Hopkins was still standing.  I believed the suspect was going to strike Officer Hopkins . . . .").

Why?  Because these tragic and chaotic events occurred in a relatively tight space in the corner of a parking lot in the dark of night.  Because the officers were investigating a suspicious vehicle with two suspects inside, and they learned during the incident that the car had been reported stolen.[150]  Because Dawes and Rosales had ignored the officers' countless, screamed commands.  Because Dawes had hit Officer Hess's squad car while he was in it.  Because Dawes had driven into the fence with enough force to crumple it.  Because Officer Hess had stood beside and observed Officers Kimpel and Hopkins behind Dawes's car just seconds before Dawes cranked her car and began her apparent, chaotic attempt to flee.[151]  Because Officer Hess's body was facing the corner of the parking lot and the rear right corner of Dawes's car with his gun trained on her car, while Officers Kimpel and Hopkins walked approximately behind and to Officer Hess's left.[152]  Because, as shown by Officer Hopkins's bodycam footage, he and Officer Kimpel had barely moved out of Dawes's path by the time that Officer Hess fired the first shot.[153]  Because, also from the viewpoint of Officer Hopkins's bodycam, Officer Kimpel was in front of and to the left of Officer Hopkins as Officer Kimpel moved out of Dawes's direct path.[154]  Because, even after the officers had fired multiple times, Dawes continued to drive in reverse.

---

[150] *See Harmon*, 16 F.4th at 1163 (noting that courts consider the "severity of the crime at issue").

[151] *See id.* (noting that courts consider whether the suspect was "attempting to evade arrest by flight").

[152] *See* Hess Bodycam at 1:06–1:12; Hopkins Bodycam at 6:08–6:13.

[153] Hopkins Bodycam at 6:12–6:19; *see also Lytle*, 560 F.3d at 413–14 (noting that the period of time in *Hathaway*, 507 F.3d 312, was "insufficient for the officer to perceive new information indicating the threat was past").

[154] Hopkins Bodycam at 5:58–6:16.

Because the officers reasonably believed that Dawes was attempting to flee and had been unsuccessful at doing so through the fence in front of her car, leaving the only next possible route being the access path/road in which the officers stood by the squad car.  Because Officers Hess and Kimpel reasonably believed that at least one other officer was "at least generally" in the "projected path of" Dawes's vehicle.[155]

The plaintiffs argue that Officers Hess and Kimpel should have chosen reasonable, alternative courses of action, such as turning on the squad car's flashing emergency lights.  Even assuming that the plaintiffs' proposed alternatives are indeed reasonable, their argument misunderstands the constitutional question.  The constitutional "question" is "whether the Fourth Amendment *require[d]*" the officers to do something *other than* what they did.[156]  The "question is not what 'could have been achieved.'"[157]  And "a *reasonable* search does not become *unreasonable* simply because the officer might've had other reasonable alternatives."[158]  For all of the reasons that the Court has explained, Officer Hess's and Officer Kimpel's actions were reasonable, and those actions do not become unreasonable just because the officers may have had other reasonable options.  "If an officer has two reasonable alternatives . . ., she can choose either of them and behave reasonably."[159]

---

[155] *Edwards v. Oliver*, 31 F.4th 925, 931 (5th Cir. 2022) (quoting *Irwin*, 2021 WL 4932988, at *3).

[156] *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983).

[157] *Id.*

[158] *Ramirez v. Guadarrama*, 2 F.4th 506, 513 (5th Cir. 2021) (Oldham, J.) (concurring in denial of rehearing *en banc*), *cert. denied*, 142 S. Ct. 2571 (June 30, 2022).

[159] *Id.*

The plaintiffs also note that Officers Hess and Kimpel were later found to have contravened police-department policy.  But "a law enforcement officer's violation of department policy 'is constitutionally irrelevant' for purposes of a claim brought under § 1983."[160]

"[T]he threat of harm must be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[161] The Court's analysis must "allow[] for the fact that police officers are often forced to make split-second judgments" and the Court must be slow to second-guess the officers' on-scene assessment.[162]  In light of the facts and the law, the Court finds that only a Monday-morning quarterback could side with the plaintiffs.[163]  Therefore, the Court must

---

[160] *Craven v. Perry Cnty.*, No. 2:12-CV-99-KS-MTP, 2013 WL 4458771, at *9 (S.D. Miss. Aug. 16, 2013) (quoting *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009)).  *See also Scott v. Harris*, 550 U.S. 372, 375 n.1 (2007) ("It is irrelevant to our analysis whether Scott had permission to take the precise actions he took.").

[161] *Harmon*, 16 F.4th at 1165 (quoting *Graham*, 490 U.S. at 396).

[162] *Graham*, 490 U.S. at 397; *see also Ryburn*, 565 U.S. at 477.

[163] The Fifth Circuit recently issued a qualified-immunity opinion in *Edwards v. Oliver*, 31 F.4th 925.  In that case, suspects were slowly reversing their car away from two police officers as the officers commanded the suspects to stop.  *Id.* at 928.  Then, the suspects changed direction and began accelerating "past" one of the police officers.  *Id.*  The other officer opened fire, killing one of the car's passengers.  *Id.*  Unlike in this case, the district court in *Edwards* adopted the magistrate judge's finding that there was a genuine dispute of material fact precluding summary judgment.  The Fifth Circuit agreed and said:

> [T]he extent of the car's threat to Officer Gross is the factual question at the heart of this case, and despite Oliver's argument to the contrary, it is a genuinely *disputed* question.  Oliver describes that the car accelerated 'towards/near/by' Officer Gross, whereas plaintiffs assert that Officer Gross was never in the path of the vehicle.  The magistrate judge identified this as the crux of the factual dispute warranting denial of summary judgment: '[T]he body-camera footage sufficiently raises a fact question . . . [about the car's] threat of harm to [Officer] Gross because it was moving away' from him.

*Id.* at 930.

First, *Edwards* is meaningfully different from this case because, here, the Court concludes that it simply cannot side with the plaintiffs without engaging in the Monday-morning quarterbacking that

grant Officers Hess and Kimpel qualified immunity on the additional ground that they did not violate the Constitution.

## IV.      Evidentiary Rulings

The Magistrate Judge made recommendations on various of the parties' evidentiary objections.[164]  The Court finds no error in them and **ACCEPTS** the Magistrate Judge's recommendations.

---

the Fifth Circuit repeatedly warns against.  Second, another meaningful difference is that, in *Edwards*, the magistrate judge didn't mention or acknowledge in its findings, conclusion, and recommendation the officers' evidence about their perception that they "heard the window shatter right next to" one of the officers, which may have "sounded like a gunshot."  *Id.*  Because of that, the Fifth Circuit "d[id] not have jurisdiction to consider . . . an argument" based on that perception.  *Id.*  In contrast, here and for the reasons explained above the line, Officers Hess and Kimpel had a reasonable basis to believe that at least one officer was in the path of Dawes's vehicle as she reversed.  Third, here and in contrast to *Edwards*, the Court finds that the officers reasonably interpreted the law in existence as of January 18, 2017 to conclude that the perceived threat was sufficient to justify deadly force.  *Reyes*, 362 F. App'x at 408.  Fourth, unlike in *Edwards*, the bodycam footage here does not "sufficiently raise[] a fact question."  *Edwards*, 31 F.4th at 930.  Finally, even if the plaintiffs were to win the *Edwards* battle, they would still lose the war—because they have not carried their burden on the clearly-established-law-prong.  The Fifth Circuit has repeatedly affirmed grants of qualified immunity in equally factually analogous cases.  *See, e.g.*, *Goldston*, 775 F. App'x 772; *Irwin*, 2021 WL 4932988.  And "[c]ases cutting both ways do not clearly establish the law."  *Morrow*, 917 F.3d at 879.

But if the Fifth Circuit ends up disagreeing with the Court on the above points, then *Edwards* controls.  And it appears to the Court that *Edwards*—when it controls—might hold that every qualified-immunity case involving excessive force and a suspect in a vehicle must go to a jury if the plaintiffs and defendants disagree as to the extent of the harm that the suspect's vehicle posed—even if everyone agrees about what actually happened on the scene, *i.e.*, that the videos are accurate depictions of what occurred.  But wouldn't that be every case in this category?  Of course the plaintiffs think that their actions didn't pose a sufficient threat of harm to the officers, and of course the officers think the opposite.

[164] Doc. No. 136 at 2–8.

## V.     Conclusion

The Court **ACCEPTS IN PART** and **REJECTS IN PART** the Magistrate

Judge's report and **GRANTS** the defendants' motion for summary judgment.

**IT IS SO ORDERED** this 11th day of August, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE